

# U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
### Adversary Proceeding #: 08-00072
#### Internal Use Only

**FILED**

MAR 1 0 2008    **NF**

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

*Assigned to:* Jacqueline P. Cox
*Related BK Case:* 07-03856
*Related BK Title:* J.S. II, L.L.C.
*Related BK Chapter:* 11
*Demand:* $1000000

*Nature[s] of*  14 Recovery of money/property -
*Suit:*              other

          81 Subordination of claim or
             interest

*Date Filed:* 02/05/08

This is to certify that the within and attached
document is a full, true and correct copy of
the original thereof as the same appears on
file in the office of the Clerk of the United
States Bankruptcy Court for the Northern
District of Illinois

KENNETH S. GARDNER
CLERK OF COURT

By _____
Deputy Clerk
Dated March 10, 2008

## Plaintiff
-----------------------

**JS, II L.L.C.**

08CV1425
JUDGE KENDALL
MAGISTRATE JUDGE MASON

represented **Janice A Alwin**
by Shaw Gussis Fishman Glantz Wolfson & Tow
321 N Clark St Ste 800
Chicago, IL 60610
312-276-1323
Fax : 312-275-0571
Email: jalwin@shawgussis.com

**Jarret Raab**
Shaw Gussis Fishman Glantz Wolfson & Tow
321 N. Clark St.
Suite 800
Chicago, IL 60610
312-541-0151
Fax : (312) 980-3888
Email: jraab@shawgussis.com

**Richard A. Saldinger**
Shaw Gussis
321 N. Clark Street
Chicago, IL 60610
312 541-0151
Fax : 312 275-0563
Email: rsaldinger@shawgussis.com

**Robert Radasevich**
Neal Gerber & Eisenberg LLP

Two North LaSalle St Ste 2200
Chicago, IL 60602
312-269-8039
Fax : 31 578-4947
Email: rradasevich@ngelaw.com

**Steven B Towbin**
ShawGussisFishmanGlantzWolfson&TowbinLLC

321 N Clark St
Suite 800
Chicago, IL 60610
312-276-1333
Fax : 312-275-0569
Email: stowbin@shawgussis.com
*LEAD ATTORNEY*

| | | |
|---|---|---|
| **River Village I, LLC** | represented by | **Janice A Alwin**<br>(See above for address) |

**Jarret Raab**
(See above for address)

**Richard A. Saldinger**
(See above for address)

**Steven B Towbin**
(See above for address)
*LEAD ATTORNEY*

**River Village West, LLC** represented by **Janice A Alwin**
(See above for address)

**Jarret Raab**
(See above for address)

**Richard A. Saldinger**
(See above for address)

**Steven B Towbin**
(See above for address)
*LEAD ATTORNEY*

**KND Investments, LLC** represented by **Janice A Alwin**
(See above for address)

**Jarret Raab**
(See above for address)

**Richard A. Saldinger**
(See above for address)

**Steven B Towbin**

(See above for address)
*LEAD ATTORNEY*


V.


**Defendant**
----------------------

| **Brickcraft, Inc.** | represented **Robert Radasevich**<br>by (See above for address) |
| **Anthony Splendoria** | represented **Robert Radasevich**<br>by (See above for address) |
| **Robert Splendoria** | represented **Robert Radasevich**<br>by (See above for address) |

| Filing Date | # | Docket Text |
|---|---|---|
| 02/05/2008 | ⊕1 | Adversary case 08-00072. (14 (Recovery of money/property - other)), (81 (Subordination of claim or interest)): Complaint by JS, II L.L.C., River Village I, LLC, River Village West, LLC, KND Investments, LLC against Brickcraft, Inc., Anthony Splendoria, Robert Splendoria. Fee Amount $250. Status hearing to be held on 3/11/2008 at 09:30 AM at 219 South Dearborn, Courtroom 619, Chicago, Illinois 60604. (Saldinger, Richard) (Entered: 02/05/2008) |
| 02/05/2008 | ⊕2 | <u>Summons Link</u> Summons Issued on Brickcraft, Inc. Answer Due 03/6/2008; Anthony Splendoria Answer Due 03/6/2008; Robert Splendoria Answer Due 03/6/2008 (Saldinger, Richard) (Entered: 02/05/2008) |
| 02/05/2008 | 3 | Receipt of Complaint(08-00072) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 8274378. Fee Amount $ 250.00 (U.S. Treasury) (Entered: 02/05/2008) |
| 02/06/2008 | ⊕4 | Summons Service Executed on Brickcraft, Inc. 2/6/2008 (RE: [2] Summons Issued). (Saldinger, Richard) (Entered: 02/06/2008) |
| 02/06/2008 | ⊕5 | Summons Service Executed on Anthony Splendoria 2/6/2008 (RE: [2] Summons Issued). (Saldinger, Richard) |

| | | (Entered: 02/06/2008) |
|---|---|---|
| 02/06/2008 | ●6 | Summons Service Executed on Robert Splendoria 2/6/2008 (RE: [2] Summons Issued). (Saldinger, Richard) (Entered: 02/06/2008) |
| 03/06/2008 | ●7 | Appearance Filed by Robert Radasevich on behalf of JS, II L.L.C., Anthony Splendoria, Robert Splendoria. (Radasevich, Robert) Modified on 3/10/2008 to correct docket text to include on behalf of Brickcraft Inc and remove on behalf of JS, II LLC (Green, Charlie). (Entered: 03/06/2008) |
| 03/06/2008 | ●8 | Appearance Filed by Robert Radasevich on behalf of Brickcraft, Inc., Anthony Splendoria, Robert Splendoria. (Radasevich, Robert) (Entered: 03/06/2008) |
| 03/06/2008 | ●9 | Appearance for Kathy D. Vega Filed by Robert Radasevich on behalf of Brickcraft, Inc., Anthony Splendoria, Robert Splendoria. (Radasevich, Robert) (Entered: 03/06/2008) |
| 03/06/2008 | ●10 | Appearance for Jennifer J. Lee Filed by Robert Radasevich on behalf of Brickcraft, Inc., Anthony Splendoria, Robert Splendoria. (Radasevich, Robert) (Entered: 03/06/2008) |
| 03/06/2008 | ●11 | Motion for Withdrawal of Reference. Fee Amount $150 Filed by Robert Radasevich on behalf of Anthony Splendoria, Robert Splendoria. (Attachments: # 1 Exhibit # 2 Exhibit) (Radasevich, Robert) Modified on 3/10/2008 to correct on behalf of to include Brickcraft , Inc.(Offord, Donna). (Entered: 03/06/2008) |
| 03/06/2008 | 12 | Receipt of Motion for Withdrawal of Reference(08-00072) [motion,mwdref] ( 150.00) Filing Fee. Receipt number 8434614. Fee Amount $ 150.00 (U.S. Treasury) (Entered: 03/06/2008) |
| 03/06/2008 | ●13 | Notice of Filing Filed by Robert Radasevich on behalf of Anthony Splendoria, Robert Splendoria (RE: 11 Motion for Withdrawal of Reference). (Radasevich, Robert) (Entered: 03/06/2008) |
| | | |

| 03/06/2008 | ◑14 | Jury Demand Filed by Robert Radasevich on behalf of Anthony Splendoria, Robert Splendoria. (Radasevich, Robert) (Entered: 03/06/2008) |
|---|---|---|
| 03/06/2008 | ◑15 | Notice of Filing Filed by Robert Radasevich on behalf of Anthony Splendoria, Robert Splendoria (RE: 14 Jury Demand). (Radasevich, Robert) (Entered: 03/06/2008) |
| 03/10/2008 | ◑16 | CORRECTIVE ENTRY to correct docket text to include on behalf of Brickcraft Inc and remove on behalf of JS, II LLC (RE: 7 Appearance, ). (Green, Charlie) (Entered: 03/10/2008) |
| 03/10/2008 | ◑17 | Appearance Filed by Janice A Alwin on behalf of JS, II L.L.C., KND Investments, LLC, River Village I, LLC, River Village West, LLC. (Alwin, Janice) (Entered: 03/10/2008) |
| 03/10/2008 | ◑18 | CORRECTIVE ENTRY Modified on 3/10/2008 to correct on behalf of to include Brickcraft , Inc (RE: 11 Motion for Withdrawal of Reference, ). (Offord, Donna) (Entered: 03/10/2008) |

**U S Bankruptcy Court - Northern District of Illinois**



# FILED

## MAR 1 0 2008  NF

KENNETH S. GARDNER, CLERK

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

Date _____**March 10,2008**_____

08CV1425
JUDGE KENDALL
MAGISTRATE JUDGE MASON

United States District Court
Northern District of Illinois
Chicago, IL 60604

Re:     Case Number          **08-A-72**

Case Name                    **J.S. II L.L.C et al -VS- Brickcraft Inc et al**

Bankruptcy Judge     **Cox**

To Whom It May Concern:

Pursuant to Rule 5011 of the Federal Rules of Bankruptcy Procedure, transmitted herewith is the Motion for Withdrawal of Reference.

Filed By: _____**Robert Radasevich**_____

Previous District Court Judge (when applicable): _____

Previous Civil Case Number (when applicable): _____

KENNETH S. GARDNER, CLERK

By:
_____**Michael Flowers, Team A**_____
Deputy Clerk  -

_michael Flowers_          _March 10, 2008_

cc:     Bankruptcy Judge & Party Who Filed Motion for Withdrawal of Reference

FILED

MAR 1 0 2008   NF

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| J.S. II, L.L.C., et al, | ) | Case No. 07-11565 |
| | ) | (Jointly Administered) |
| Debtors. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| | ) | |
| J.S. II, L.L.C., RIVER VILLAGE I, L.L.C., RIVER | ) | |
| VILLAGE WEST, L.L.C., AND KND | ) | |
| INVESTMENTS, L.L.C., , | ) | |
| | ) | Adv. No. 08-00072 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08CV1425 |
| | ) | JUDGE KENDALL |
| BRICKCRAFT, INC., ANTHONY SPLENDORIA | ) | MAGISTRATE JUDGE MASON |
| AND ROBERT SPLENDORIA, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE WITH INCORPORATED MEMORANDUM OF LAW

Defendants Brickcraft, Inc. ("Brickcraft"), Anthony Splendoria ("Anthony"), and Robert

Splendoria[1] ("Robert" and together with Brickcraft and Anthony, the "Defendants"), by and

through their attorneys, Neal, Gerber & Eisenberg, LLP, respectfully request that the United

States District Court for the Northern District of Illinois, Eastern Division (the "District Court")[2]

enter an Order, pursuant to 28 U.S.C. § 157(d), withdrawing the reference of the above-

captioned adversary proceeding (the "Adversary") to the Bankruptcy Court. In support of this

Motion to Withdraw the Reference (the "Motion"), the Defendants state as follows:

---

[1] Anthony and Robert are sometimes collectively referred to herein as the "Individual Defendants"

[2] Although filed in the Bankruptcy Court, this motion is addressed to the District Court pursuant to Rule 5011(a) of the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION

1.    The Adversary is the latest iteration in the Plaintiffs' endless pursuit of someone to blame for its failed construction project in the Bridgeport neighborhood of Chicago known as Bridgeport Village (the "Project").

2.    As alleged in the Debtor's Adversary Complaint[3], Brickcraft was retained in 2002 to provide outside masonry work on seven model homes in Bridgeport Village (Complaint, ¶ 23).  When Brickcraft was not paid the approximately $150,000 remaining on its contract upon completion of its work, it filed mechanics liens against the Project in May 2002. (Complaint, ¶ 25). Brickcraft was never paid the remaining monies due under its contract.

3.    On May 11, 2003, a year after Brickcraft had completed its work and filed its mechanics liens, a storm went through the Chicagoland area, and several of the homes under construction in the Project were severely structurally damaged. (Complaint, ¶ 28).

4.    Brickcraft subsequently initiated an investigation into the collapse of these homes.

5.    The Debtors contend that over the next four years, the Defendants embarked on "a vindictive crusade designed to bring down the Plaintiffs at all costs" (Complaint, ¶ 28) by commissioning fallacious engineering studies which they used to "defame the Plaintiffs' business and tortiously interfere with the Plaintiffs' economic relationships with the Bank of America [a long time lender to the Plaintiffs] and the homeowners of Bridgeport Village." (Complaint, Introductory paragraph).

6.    The Debtors purport to frame three causes of action against the Defendants arising from the Defendants' alleged wrongful conduct.  Count I alleges a defamation action against all three Defendants under Illinois common law.  Count II alleges a claim under Illinois common

---

[3] A true and correct copy of the Trustee's complaint commencing the Adversary is attached hereto and incorporated herein as Exhibit A to this Motion.

2

law for intentional interference with prospective economic advantage and business relations against all three Defendants. Lastly, Count III is asserted solely against Brickcraft and seeks to have the claim filed by Brickcraft in the Debtors' bankruptcy case equitably subordinated to the payment of all other claims pursuant to section 510(c) of the Bankruptcy Code. 11 U.S.C. § 510(c). The docket in the underlying bankruptcy case indicates that the Debtors have also filed an objection seeking to disallow Brickcraft's claim in its entirety.

7.    The Defendants have not yet filed any responsive pleadings to the Adversary Complaint. (A certified copy of the Docket from the Adversary proceeding is attached hereto as Exhibit B).

8.    Contemporaneously with this filing, the Individual Defendants have filed a Jury Demand pursuant to Bankruptcy Rule 9015 and therefore have properly invoked their constitutional right to a jury trial on Counts I and II asserted against them. The Individual Defendants do not consent to the conduct of a jury trial on those claims in the Bankruptcy Court.

## ARGUMENT

9.    Defendants seek to withdraw the reference of this Adversary to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d), which provides in relevant part:

> The district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court], on its own motion or on timely motion of any party, for cause shown. The District Court shall, on timely motion of a party, to withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

10.    While the phrase "for cause shown" is not defined in section 157(d), courts have interpreted the phrase to require considering the following factors:

> whether the claim or proceeding is core or non-core, considerations of judicial economy, convenience, the particular court's knowledge

NGEDOCS: 1510871.3

of the facts, promoting uniformity and efficiency of bankruptcy administration, reduction of forum shopping and confusion, conservation of debtor and creditor resources, and whether the parties requested a jury trial.

In re K&R Express Systems, Inc. v. LaSalle Bank National Association, Case No. 07 C 2837, 2007 U.S. Dist. LEXIS 62878, *7 (N.D. Ill. Aug. 23 2007), citing In re Sevko, 143 B.R. 114, 117 (N.D. Ill. 1992). See also, Wellman Thermal Systems Corp. v. Columbia Casualty Co., Case no. 05 C 1191, 2005 U.S. Dist. LEXIS 45725, *6-7 (S.D. Ind. Oct. 5, 2005).

11. Courts often consider the most important factor to be "whether a proceeding is core or non-core, as efficiency, uniformity and judicial economy concerns are largely subsumed within it." In re K&R Express, Case No. 07 C 2837, 2007 U.S. Dist. LEXIS 62878, *7 (N.D. Ill. Aug. 23 2007) citing Plan Adm'r v. Lone Star RV Sales, Inc. (In re Conseco Finance Corp.), 324 B.R. 50, 53 (N.D. Ill. 2005). Because a bankruptcy judge may only make recommendations (subject to *de novo* review) in a non-core proceeding, "withdrawing the reference for non-core matters avoids unnecessary duplication of judicial effort." In re Conseco, 324 B.R. 50, 54 (N.D. Ill. 2005); see also Coe-Truman Technologies, Inc. v. United States Government (In re Coe-Truman Technologies, Inc.), 214 B.R. 183, 187 (N.D. Ill. 1997) (the fact that the proceeding is non-core "weighs heavily in favor of withdrawing the reference" because it would be a "more efficient use of judicial resources for the [district court] to decide this case in the first instance").

12. In this case, consideration of these factors weighs heavily in favor of withdrawing the reference of this Adversary to the Bankruptcy Court.

13. Here, Counts I and II in the Adversary Complaint are properly considered non-core claims. A proceeding is core if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." Diamond Mortg. Corp. of Illinois v. Sugar, 913 F.2d 1233, 1239 (7th Cir. 1990). In other words, the "Code

4

itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state law." In re U.S. Brass Corp., 110 F.3d 1261, 1268 (7th Cir. 1997). Here, Counts I and II are predicated on acts that occurred years before the bankruptcy filing and assert claims arising entirely under state law. Accord Novak v. Lorenz (In re John B. Novak), 116 B.R. 626, 627 (N.D. Ill. 1990) (breach of contract and tortious interference claims were non-core proceedings). Indeed, as the Debtors have admitted in their allegations (Complaint ¶6), the Bankruptcy Court would have jurisdiction over those counts only as "related to" proceedings under 28 U.S.C. § 157(a).[4]

14.    Further, the Individual Defendants have asserted their constitutional right to a jury trial over these non-core claims by filing a Jury Demand pursuant to Bankruptcy Rule 9015 and indicating they have not and will not consent to trial of Counts I and II by the bankruptcy court. In a non-core proceeding, the right to a jury trial alone is considered "sufficient cause to withdraw the reference to the bankruptcy court." Wellman Thermal Systems Corp. v. Columbia Casualty Co., Case no. 05 C 1191, 2005 U.S. Dist. LEXIS 45725, *10 (S.D. Ind. Oct. 5, 2005); see Comdisco Ventures, Inc. v. Federal Insurance Company, No. 04 C2007, 2004 WL 1375353 at *4 (N.D. Ill. June 18, 2004) (noting that cause to withdraw the reference 'automatically exists' where the proceeding was non-core and the defendants demanded a jury trial and did not consent to proceeding before the bankruptcy court).

---

[4]    The state law claims against the Individual Defendants and Brickcraft should not be considered "core" because Counts I and II do not "arise out of the same transaction" as Brickcraft's proof of claim. The adjudication of Counts I and II does not "require consideration of issues raised by the proofs of claim...such that the two are logically related." CDX Liquidating Trust v. Venrock Assoc., Case No. 04 C 7236, 2005 U.S. Dist. LEXIS 16704, *6-7 (N.D.Ill. 2005). Brickcraft's proof of claim relates to unpaid amounts due to Brickcraft for masonry services it performed on seven houses owned by the Debtors prior to May 2002. The Debtors' asserted causes of action against Brickcraft and the Individual Defendants are based on a course of conduct allegedly engaged in by Anthony and Robert Splendoria – both individually and on behalf of Brickcraft – commencing in May 2003 and stemming from an investigation into collapsed home at the Project. Accord In re K&R Express, Case No. 07 C 2837, 2007 U.S. Dist. LEXIS 62878, *8-9.

NGFDOCS: 1510871.3

15.     Withdrawing the reference will not negatively impact uniformity and efficiency of bankruptcy administration or promote forum shopping. The facts and the law embroiled in Counts I and II of the Adversary neither arise under the Bankruptcy Code nor are unique to the bankruptcy process. See, e.g., In re Coe-Truman Technologies, Inc., 214 B.R. at 187 (no risk of forum shopping or adversely affecting the uniform administration of bankruptcy law because the adversary issues are governed mainly by non-bankruptcy law).

16.     Because this Adversary is in its infancy, the Bankruptcy Court does not have any more familiarity with the facts of the Adversary than the District Court. Compare CDX Liquidating Trust, 2005 U.S. Dist. LEXIS 16704 at *13 (refusing to withdraw the reference because it made "no sense to withdraw the case at this stage given the bankruptcy court's familiarity with the parties and the complex facts of the case"); Hedstrom Corporation, et. al. v. Wal-Mart Stores, Inc., Case no. 05 C 6888, 2006 U.S. Dist. LEXIS 29656 * 10 (N.D. Ill. April 24, 2006) (the proceeding was better left with the bankruptcy court where the bankruptcy court was "already familiar with the facts and the parties"). No discovery has been conducted in this Adversary, the initial status conference has yet to occur and neither party will suffer any prejudice by withdrawing the Adversary to the District Court.

17.     The Defendants have filed this Motion in a timely fashion as required by 28 U.S.C. § 157(d), by filing the Motion by the date they were even required to file responsive pleadings to the Complaint.

18.     Accordingly, cause exists to withdraw the reference to the Bankruptcy Court as to Counts I and II in the Adversary.

19.     Moreover, cause also exists to withdraw the reference as to the equitable subordination claim asserted in Count III. While an equitable subordination claim may be

considered a core proceeding, the district court may withdraw the reference irrespective of whether the claim is core or non-core. In re Sevko, Inc., 143 B.R. 114, 115 -116 (N.D. Ill.1992) ("The court may withdraw its reference regardless of whether the matter is a core or non-core proceeding..."). Where there is a significant overlap between the facts and transactions at issue, judicial economy and the risk of inconsistent judgments weigh in favor of withdrawing the reference. See Wedtech Corp., v. R. Kent London, M.D., et. al. (In re Wedtech Corp.), 81 B.R. 237, 239 (S.D.N.Y. 1987) (withdrawing a core proceeding where there were common questions of law and fact, "creating the inconvenience and unnecessary expense of litigating the same issue in two separate forums, and the risk of inconsistent results").

20.     Here, considerations of judicial economy weigh in favor of withdrawing the reference as to all three Counts. Equitable subordination requires a finding of some type of inequitable conduct.[5] The predicate acts (i.e. allegedly inequitable conduct) forming the basis of the Debtors' claim for equitable subordination in Count III are exactly the same predicate acts – allegedly committed by the same Individual Defendants – that provide the basis for the Debtors' state law claims asserted against the Individual Defendants in Counts I and II. Determination of identical factual questions by two different courts in two different proceedings would be a waste of judicial and party resources and will give rise to complicated issues of collateral estoppel, *res judicata* and the possibility of inconsistent results. See Comdisco Ventures, Inc., 2004 WL 1375353 at *4 (noting that it makes "little sense" to separate proceedings between the bankruptcy and district court where it was likely to "cost all the parties less to litigate the claims in one forum rather than two").

---

[5] See In re Kreisler, 331 B.R. 364, 381 (Bankr. N.D. Ill. 2005) (listing the elements of equitable subordination as: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred some unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with other provisions of the Bankruptcy Code).

7

21.     The inefficiency of proceeding in two forums was recently addressed in In re
K&R Express Systems, Case No. 07 C 2837, 2007 U.S. Dist. LEXIS 62878. In that case, the
bankruptcy trustee brought claims against LaSalle Bank National Association ("LaSalle"),
Robert Rogulie ("Rogulie") and Midwest Freightways, Inc. ("Midwest") for breach of contract,
breach of fiduciary duty, aiding and abetting that breach, for monies owed, and for unjust
enrichment. The Defendants – including LaSalle who had filed a proof of claim in the Debtor's
estate – moved to withdraw the reference to the Bankruptcy Court. As in the instant case, the
Court found that the trustee's claims against LaSalle and the other defendants were not related to
LaSalle's proof of claim and could have been filed outside of the bankruptcy context. Id. at *9.
Further, as in the instant case, the defendants who had not filed proofs of claims had invoked
their constitutional right to a jury trial on the trustee's non-core claims. Id. at *11-12. While
recognizing that one of the three defendants, LaSalle, had filed a proof of claim and thus waived
its right to a jury trial,[6] the Court found that the other defendants' right to a jury trial on the non-
core claims asserted against them to be largely dispositive:

> At the same time, neither Midwest nor Rogulie have filed proofs of
> claim in the bankruptcy court, and their demand for jury trial
> requires that a decision on the Trustee's claims against them be
> rendered in this court....While it may be possible for the
> bankruptcy court to handle the Trustee's claims against LaSalle,
> while this court hears the claims against Midwest and Rogulie, we
> find that considerations of judicial economy and confusion weigh
> against such an action. It would be inefficient to have the
> bankruptcy court decide whether or not LaSalle aided and abetted
> Rodgulie's alleged breach of fiduciary duty, while at the same time
> this court determines whether or not Rogulie breached that duty in
> the first place. The need for conservation of the debtor's estate
> further necessitates a finding that the Trustee not be forced to
> prosecute its related claims in two different forums. Furthermore,
> we find that withdrawal will not hinder the uniformity and

---

[6] By filing proofs of claim, both LaSalle in K&R Express and Brickcraft in the instant case voluntarily
submitted themselves to the equitable jurisdiction of the Bankruptcy Court and waived their right to a jury
trial. S.N.A. Nut Co. v. Haagen-Daz Co., Case no. 00 C 2820, 2000 U.S. Dist. LEXIS 10430 (N.D. Ill.
July 17, 2000) aff'd, S.N.A. Nut Co. v. Haagen-Dazs Co., 302 F.3d 725, 730 (7th Cir. 2002).

> efficiency of bankruptcy administration as these claims do not involve questions or interpretations of bankruptcy law.
>
> We hold that regardless to the status of LaSalle's right to a jury trial or the nature of the trustee's claims against it, all of the trustee's claims in this adversary proceeding should be tried together in one forum. Since, for Midwest and Rogulie, that forum necessarily would be this court, we withdraw the reference as to the trustee's claims against Midwest and Rogulie, as well as the trustee's claims against LaSalle, out of convenience for the courts and the parties, and for the reasons hereinbefore stated.

In re K&R Express, Case no. 07 C 2837, 2007 U.S. Dist. LEXIS 62878, *12-13.

22.     As was the case in K&R Express, the Debtors here have filed claims not just against a creditor of the estate (Brickcraft) who no longer possesses a right to a jury trial but against two other parties (the Individual Defendants), each of whom has asserted their constitutional right to a jury trial and refused to consent to a trial by the bankruptcy court. The claims against all three parties are based on precisely the same operative facts, all of which occurred prior to the debtor's bankruptcy, all of which are unrelated to Brickcraft's proof of claim, and all of which give rise to claims, if at all, solely under state law. In fact, in the instant case, the overlap is even more dramatic because Brickcraft, a corporation, is only alleged to have acted by and through Anthony and Robert Splendoria. It would be inefficient to the extreme for one court to determine whether alleged misconduct by Anthony and Robert Splendoria gives rise to defamation and tortious interference claims against them while another court determines whether the same alleged misconduct provides a basis to equitably subordinate Brickcraft's claim. Thus, the same concerns for preservation of resources and protection of constitutional rights to jury trial which prompted the court to withdraw the reference in K&R Express should similarly persuade the Court to withdraw the reference to the Bankruptcy Court over the entire Adversary.

23.    The non-core nature of the claims asserted in Counts I and II, the Individual Defendants' constitutional right to a jury trial, the presence of identical underlying facts, and considerations of judicial economy weigh in favor of withdrawing the reference on all three Counts of this Adversary.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request entry of an Order withdrawing the reference of this Adversary Proceeding from the Bankruptcy Court and transferring this Adversary to the United States District Court for the Northern District of Illinois.

Dated: March 6, 2008                    Respectfully submitted,

BRICKCRAFT, INC., ANTHONY SPLENDORIA
AND ROBERT SPLENDORIA


By: /s/ Robert Radasevich
    One of their Attorneys

    Robert Radasevich
    Katherine D. Vega
    Jennifer Lee
    NEAL, GERBER & EISENBERG LLP
    Two North LaSalle Street, Suite 2200
    Chicago, Illinois  60602
    (312) 269-8000 (telephone)
    (312) 269-1747 (facsimile)

10

# Exhibit A

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re:                    )     Chapter 11

                              )     Case No. 07-03856

                              )     (Jointly Administered)

         JS II, L.L.C., *et al.*,        )     Hon. Jacqueline P. Cox

                              )

                       Debtors.     )

---

J.S. II, L.L.C., River Village I, L.L.C.,
River Village West, L.L.C. and KND
Investments, LLC,

                **Plaintiffs,**

v.                                        Adv. Proc. No. **08-00072**

Brickcraft, Inc., Anthony Splendoria and
Robert Splendoria,

                **Defendants.**

## ADVERSARY COMPLAINT

Debtors J.S. II, L.L.C. ("JS II"), River Village I, L.L.C. ("River Village"), River Village

West, L.L.C. ("River Village West"), and KND Investments, L.L.C. ("KND," and together with

JS II, River Village I, River Village West, "Plaintiffs" or "Debtors"), bring this adversary

proceeding against Brickcraft, Inc. ("Brickcraft"), Anthony Splendoria ("A. Splendoria"), and

Robert Splendoria ("R. Splendoria" and, together with A. Splendoria, the "Splendoria Brothers")

for defamation, tortious interference with prospective economic advantage and business relations

and for the equitable subordination of Brickcraft's claims against the Plaintiffs' estate.   In

support of this adversary complaint, the Plaintiffs state as follows:

{5618 CMP A0198996.DOC 2}

4.     The claims in this Adversary Complaint arise in and relate to the Cases. Therefore, this Court has subject matter jurisdiction over this Adversary Complaint pursuant to 28 U.S.C. §§ 157(a) and (b) and 28 U.S.C. § 1334(b).

5.     This Court has core jurisdiction to hear and determine the Debtors' claims against Brickcraft because the claims are counterclaims to Brickcraft's Proof of Claim.

6.     This Court has "related to" jurisdiction to hear the claims against the Splendoria Brothers because they are related to the claims against Brickcraft, the claims are property of the Debtors' estates and the claims are related to the Debtors' Cases.

7.     As to the counts in this Adversary Complaint that are "non-core," the Plaintiffs consent to the entry of final orders or judgment by the Bankruptcy Court.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) as this Adversary Complaint is brought in the Debtors' chapter 11 Cases that are pending in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.    The Parties

9.     Debtor JS II is an Illinois limited liability company and the owner of a major residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago known as Bridgeport Village, as well as other nearby parcels acquired for future development.

10.    Debtor River Village is an Illinois limited liability company.

11.    Debtor River Village West is an Illinois limited liability.

12.    Brickcraft is an Illinois corporation with its principal place of business in Willowbrook, Illinois.

{5618 CMP A0198996.DOC 2}

Still further, Brickcraft and the Splendoria Brothers distributed the July 15 Report against the wishes of Stuart Jacobson and Harry Allen, who did not intend for the report to be provided to third parties without their permission.

39.    BOA again told Brickcraft and the Splendoria Brothers to speak with the Plaintiffs, but BOA's request fell on deaf ears. Brickcraft and the Splendoria Brothers continued to pepper BOA with letters claiming that they had "life safety" concerns. In their July 7, 2004 letter to BOA, Brickcraft and the Splendoria Brothers again threatened to take their alleged concerns to the homeowners.

40.    By letter dated July 7, 2004, the Plaintiffs informed Brickcraft and the Splendoria Brothers that their concerns regarding the structural integrity of the homes were not well founded. Brickcraft and the Splendoria Brothers, however, were still not satisfied.

41.    As a result, Brickcraft and the Splendoria Brothers continued to send letter after letter to the Plaintiffs demanding information about the construction of the homes and threatening to go to the homeowners and the City if their demands were not met. While Brickcraft attempted to persuade the Plaintiffs that their concerns were independent of their desire to get paid, Brickcraft continued to seek payment of the outstanding balance allegedly due.

42.    Beginning in August 2004, the letters from Brickcraft and the Splendoria Brothers included more threats to go to the homeowners and/or the City of Chicago if the Plaintiffs did not meet Brickcraft's demands for information.

43.    Although they were under no obligation to do so, the Plaintiffs did provide Brickcraft with additional information regarding the structural integrity of the homes, including revised structural drawings. However, the revised structural drawings provided to Brickcraft

{5618 CMP A0198996.DOC 2}

9

52.   By letter dated March 3, 2006, the Plaintiffs responded to the defamatory letter by letting the homeowners know that the Plaintiffs were in ongoing discussions with the City and they would be willing to speak with the homeowners at anytime to address any of their concerns. Of course, the Plaintiffs' brief written response prompted several more lengthy letters from Brickcraft and the Splendoria Brothers to all of the homeowners, with copies served on BOA, among many others.

53.   Still further, Brickcraft and the Splendoria Brothers began engaging in separate correspondence with certain individual homeowners, such as Jose Ruiz, Kathy Antunovich and Matthew and Michelle Ryan, encouraging them to raise havoc with the Plaintiffs. Indeed, at every turn, Brickcraft and the Splendoria Brothers attempted to raise concerns with the homeowners that were speculative and unsubstantiated at best.

54.   In their correspondence, Brickcraft and the Splendoria Brothers went out of their way to slander the Plaintiffs' reputation and place them in a false light. Indeed, Brickcraft and the Splendoria Brothers referred to information provided by the Plaintiffs as "smoke & mirrors" and a "gross misrepresentations of the facts." Brickcraft and the Splendoria Brothers told the homeowners that they were "too easily bs'd" by the Plaintiffs and that they did not have the ability to "cut through the [Plaintiffs'] lies and/or misrepresentations." Brickcraft and the Splendoria Brothers claimed that the Plaintiffs had committed fraud and that the "Developer [was] both personally and criminally responsible."

55.   In January 2007, Brickcraft and the Splendoria Brothers began spreading their accusations to the media.

56.   Through their communications with the media, Brickcraft and the Splendoria Brothers continued to fuel the fire they started by accusing the Plaintiffs of engaging in delay

60.    Plaintiffs incorporate the allegations in Paragraphs 1 through 61 of the Adversary Complaint as though fully set forth herein.

61.    At all relevant times, the Splendoria Brothers were acting both in their individual capacity and as officers of Brickcraft.

62.    At numerous times beginning in May 2003 and continuing through the Petition Date, Brickcraft and the Splendoria Brothers made numerous oral and written false and unprivileged statements and misrepresentations to third parties regarding the Plaintiffs and the homes built by the Plaintiffs at Bridgeport Village.

63.    These false statements and misrepresentations were and are defamatory *per se* as they imputed a lack of ability in the Plaintiffs' trade, profession and business.

64.    Moreover, these false statements and representations were recklessly made without either Brickcraft or the Splendoria Brothers conducting a proper investigation of the truth of the matters that were the subject of their statements and misrepresentations.

65.    The Plaintiffs suffered damages as a result of the false statements and misrepresentations recklessly made by Brickcraft and the Splendoria Brothers.

66.    As a direct and proximate cause of the false statements and representations recklessly made by Brickcraft and the Splendoria Brothers, Plaintiffs have incurred damages in excess of $1 million that it has spent or incurred to remedy the harm caused by Brickcraft and the Splendoria Brothers.

67.    The conduct of Brickcraft and the Splendoria Brothers was egregious and with actual malice, and justifies an award of punitive damages.

WHEREFORE, Plaintiffs respectfully requests that this Court:  (1) enter judgment in their favor and against Brickcraft and the Splendoria Brothers for defamation; (2) award

{5618 CMP A0198996.DOC 2}              14

damages in an amount to be proven at trial, plus prejudgment interest and costs; (3) award

punitive damages against Brickcraft and the Splendoria Brothers in a just amount; and (4) award

all further relief appropriate in the circumstances.

## COUNT II
### (Intentional Interference With Prospective Economic
### Advantage and Business Relations Against Brickcraft and the Splendoria Brothers)

68.    Plaintiffs incorporate the allegations in Paragraphs 1 through 61 of the Adversary

Complaint as though fully set forth herein.

69.    At all relevant times, the Splendoria Brothers were acting both in their individual

capacity and as officers of Brickcraft.

70.    In May 2003, the Plaintiffs had an ongoing, valid business relationship with Bank

of America whereby Bank of America provided certain lending and financial services to the

Plaintiffs.

71.    The Plaintiffs had a reasonable expectancy of continuing that valid business

relationship with Bank of America for so long as that relationship was necessary in connection

with the Bridgeport Village project.

72.    Brickcraft and the Splendoria Brothers were aware of the Plaintiffs' business

relationship with Bank of America and were aware of the Plaintiffs' expectancy that this

business relationship would continue at least until the completion of the Bridgeport Village

project.

73.    Brickcraft and the Splendoria Brothers intentionally and unjustifiably interfered

with the Plaintiffs' business relationship with Bank of America and induced or caused Bank of

America to terminate that relationship.

{5613 CMP A0198996.DOC 2}                         15

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in its favor and against Brickcraft on Count III as follows: (i) declaring that any and all of the claims of Brickcraft, Inc. be equitable subordinated to the claims of the general unsecured creditors pursuant to 11 U.S.C. § 510(c); and (ii) granting such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

JS II, LLC, River Village I,
LLC, River Village West, LLC
and KND Investments, LLC

Dated: February 5, 2008

By: /s/ Richard A. Saldinger
One of its attorneys

Steven B. Towbin (ARDC #2848456)
Richard A. Saldinger (ARDC #6209930)
Jarret Raab (ARDC #6294632)
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL 60610
P: (312) 276-1333
F: (312) 275-0569

*Bankruptcy Counsel to Debtors*

{5618 CMF A0198996.DOC 2}

02/15/2008  10:59    6303234214                    ADAMS&ASSOC.                        PAGE  08

**FORM B10** (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT ___Northern___ DISTRICT OF ___Illinois___ | PROOF OF CLAIM |
|---|---|

| Name of Debtor J.S.II,L.L.C.; KND Inv.LLC River Village II, LLC RiverVillage West | Case Number: 07-3856 07-3866 07-3864, 07-03866 07-3865 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Brickcraft Inc.**

Name and address where notices should be sent:

329 Chatelaine
Willowbrook, Il 60514

Telephone number: 630-325-2252

Last four digits of account or other number by which creditor identifies debtor:

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

*This Space is for Court Use Only*

Check here ☐ replaces
If this claim ☐ amends   a previously filed claim, dated:_____

**1.   Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other **labor & materials masonry**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of your SS #: _____
Unpaid compensation for services performed
from _____ to _____
       (date)           (date)

**2.   Date debt was incurred:**
May 2002

**3.   If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $_____**

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☒ Real Estate   ☐ Motor Vehicle   ☐ Other_____

Value of Collateral: $   **Mechanics Liens**

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**5.   Total Amount of Claim at Time Case Filed:**
$   240,384.72
   (unsecured)   (secured)   (priority)   (Total)

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6.   Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7.   Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8.   Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

*This Space is for Court Use Only*

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| 6/1/07 | _[signature]_ Anthony Splendoria, President |

Penalty for presenting fraudulent claims: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

4-1-07

## Bridgeport Village
## Summation of Amounts Owed Brickcraft, Inc.

| Invoice Number | Outstanding Amounts Invoiced 5/2/02 | Retainage Due |
|---|---|---|
| 02-545 | $16,715.79 | $4,301.31 |
| 02-546 | $13,128.03 | $5,208.67 |
| 02-547 | $4,253.68 | $2,032.63 |
| 02-548 | $26,797.46 | $7,867.50 |
| 02-549 | $7,495.74 | $2,547.86 |
| 02-550 | $25,835.04 | $6,620.56 |
| 02-551 | $12,307.25 | $5,197.47 |
| 02-552 | $1,170.00 | $130.00 |
| 02-553 | $40,500.00 | $4,500.00 |

| | |
|---|---|
| *Total Invoiced Amounts Plus Retainage* | **$186,608.99** |

| Less Payments to Vendors: | |
|---|---|
| Illinois Brick/Prairie | ($12,322.00) |
| Meno Stone | ($29,032.00) |
| Alcutts | ($6,220.00) |
| *Total Payments To Vendors* | **($47,574.00)** |

| | |
|---|---|
| *Plus Non-payment Interest (5%/yr - 5/02-3/07)* | **$37,004.49** |

| Plus Professional Fees Incurred by Brickcraft: | | |
|---|---|---|
| Stuart K. Jacobson | Engineering Fees | $8,680.16 |
| Sabo & Zahn | Legal Fees | $896.00 |
| Jenner & Block | Legal Fees | $40,713.86 |
| Barnes & Thornburg | Legal Fees | $14,055.22 |
| *Total Professional Fees* | | **$64,345.24** |

| | |
|---|---|
| **TOTAL OWED BRICKCRAFT** | **$240,384.72** |

00205 /2068

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60806

STATE OF ILLINOIS }
                  } ss.
COUNTY OF COOK    }

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JSII ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.      On or about August 8, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as  3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.      The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated August 8, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of $$37,881.70. Claimant performed additional work at the direction of River Village LLC in the amount of $14,205.00.

3.      Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.      As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and owing to Claimant, as to the above identified units the sum of $18,336.70 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $18,336.70 plus interest.

5.      The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 74 on the Site Plan attached hereto as Exhibit A.

Dated this _____ Day of _____, 2002.

                                    BRICKCRAFT, INC.

                                    By: _____
                                            Its General Counsel

LKARLIN:493509.2

Bix 37c

## VERIFICATION

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF COOK       )

    Lawrence M. Karlin  being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien; that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                          Lawrence M. Karlin

Subscribed and Sworn to before me
this  1 4  day of  May   2002.

     Notary Public

    "OFFICIAL SEAL"
  MARILYN M. CHAUNCEY
   Notary Public, State of Illinois
  My Commission Exp. 07-25-2002

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60606

STATE OF ILLINOIS    )
                     )  ss.
COUNTY OF COOK       )

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JSII ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.    On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.    The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of \$\$35,583.10. Claimant performed additional work at the direction of River Village LLC in the amount of \$7,450.00.

3.    Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.    As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and Owning to Claimant, as to the above identified units the sum of \$21,053.10 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of \$21,053.10 plus interest.

5.    The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 73 on the Site Plan attached hereto as Exhibit A.

Dated this _____ Day of _____, 2002.

                                        BRICKCRAFT, INC.

                                        By: _____
                                              Its General Counsel

02/15/2008  10:59    6303234214              ADAMS&ASSOC.                    PAGE  13

## VERIFICATION

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF COOK       )

      Lawrence M. Karlin  being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                                        Lawrence M. Karlin

Subscribed and Sworn to before me
this ___ day of _____, 2002.

_____
       Notary Public

"OFFICIAL SEAL"
MARILYN M. CHAUNCEY
Notary Public, State of Illinois
My Commission Exp. 07/05/2002

0020572070

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60606

STATE OF ILLINOIS ⎞
⎬ ss.
COUNTY OF COOK ⎠

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JS II, LLC ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.      On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 5 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-115-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-6001.

2.      The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of $47,374.72. Claimant performed additional work at the direction of River Village LLC in the amount of $4,600.00.

3.      Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.      As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and owning to Claimant, as to the above identified units the sum of $17,504.72, which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $17,504.72 plus interest.

5.      The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 25 on the Site Plan attached hereto as Exhibit A.

Dated this ____ Day of __May__, 2002.

                                         BRICKCRAFT, INC.


                                         By: _____
                                                Its General Counsel

LKARLIN/498509.7

## VERIFICATION

STATE OF ILLINOIS ⎫
⎬ ss.
COUNTY OF COOK ⎭

      Lawrence M. Karlin being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                                       Lawrence M. Karlin

Subscribed and Sworn to before me
this _14_ day of _____ 2002.

_____
         Notary Public

      "OFFICIAL SEAL"
   MARILYN M. CHAUNCEY
   Notary Public, State of Illinois
   My Commission Exp. 07/25/2002

LKARLIN#498309.7

02/15/2008   10:59   6303234214          ADAMS&ASSOC.          UU2U5/2U/1          PAGE   16

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60606

STATE OF ILLINOIS  )
                   )  ss.
COUNTY OF COOK     )

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JS II, LLC ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.    On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3260 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.    The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of $53,606.60. Claimant performed additional work at the direction of River Village LLC in the amount of $12,700.00.

3.    Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.    As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and owning to Claimant, as to the above identified units the sum of $32,455.60 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $32,455.60 plus interest.

5.    The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 24 on the Site Plan attached hereto as Exhibit A.

Dated this _____ Day of _____, 2002.

                              BRICKCRAFT, INC.

                              By:_____
                                   Its General Counsel

LKARLIN 299509.6                                              Ex. 543

## VERIFICATION

STATE OF ILLINOIS    }
                     } ss.

COUNTY OF COOK    )

            Lawrence M. Karlin  being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                                          Lawrence M. Karlin

Subscribed and Sworn to before me
this 19 ____ day of May ____ 2002.

                    Notary Public

> "OFFICIAL SEAL"
> MARILYN M. CHAUNCEY
> Notary Public, State of Illinois
> My Commission Exp 07/25/2002

LKARLIN:493509.6

02/15/2008  10:59   6303234214                    ADAMS&ASSOC.                         PAGE  18
                                                            0020572072

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800.
Chicago, Illinois 60606

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JS II, LLC ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.      On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

   Parcel 1:

   Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

   PIN: 17-32-108-004-0000

   Parcel 2:

   Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

   PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.      The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of $24,428.60. Claimant performed additional work at the direction of River Village LLC in the amount of $1,050.00.

3.      Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.      As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and Owning to Claimant, as to the above identified units the sum of $10,043.86 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $10,043.86 plus interest.

5.      The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 23 on the Site Plan attached hereto as Exhibit A.

   Dated this 4th Day of _____, 2002.

                                        BRICKCRAFT, INC.


                                        By: _____
                                              Its General Counsel

Box 240

02/15/2008 10:59 6303234214 ADAMS&ASSOC. PAGE 19

## VERIFICATION

STATE OF ILLINOIS )
                 ) ss.
COUNTY OF COOK )

    Lawrence M. Karlin being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                                                 Lawrence M. Karlin

Subscribed and Sworn to before me
this ___ day of _____, 2002.

_____
         Notary Public

"OFFICIAL SEAL"
MARILYN M. CHAUNCEY
Notary Public, State of Illinois
My Commission Exp. _____

LKARLIN 498509.3

02/15/2008  10:59   6303234214                    ADAMS&ASSOC.          U0Z0D72015              PAGE  28

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall  Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60606

STATE OF ILLINOIS )
                  ) ss.
COUNTY OF COOK    )

# GENERAL CONTRACTOR'S CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JS II, LLC ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.      On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.      The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing  and building of certain improvements, including furnishing of labor and materials for masonry and related services for the original contract price of $66,694.96. Claimant performed additional work at the direction of River Village LLC in the amount of $11,680.00.

3.      Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.      As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and owing to Claimant, as to the above identified units the sum of $34,664.96 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $34,664.96 plus interest.

5.      The work performed by Claimant under the aforesaid contract was furnished for that portion of the Property identified as Lot 76 on the Site Plan attached hereto as Exhibit A.

Dated this ____ Day of ____, 2002.

                                        BRICKCRAFT, INC.

                                        By: _____
                                            Its General Counsel

LKARLIN/498309.4

Bx 340

**VERIFICATION**

STATE OF ILLINOIS    } ss.
COUNTY OF COOK    }

      Lawrence M. Karlin being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                         Lawrence M. Karlin

Subscribed and Sworn to before me
this  14  day of          2002.

Notary Public

"OFFICIAL SEAL"
MARILYN M. CHAUNCEY
Notary Public, State of Illinois
My Commission Exp. 07-24-2002

02/15/2008  10:59  6303234214                ADAMS&ASSOC.                    PAGE  22

This Document Prepared
by and mail to:

Lawrence M. Karlin, Esq.
Katz Randall Weinberg & Richmond
333 W. Wacker Drive, Ste. 1800
Chicago, Illinois 60606

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF COOK         )

## GENERAL CONTRACTOR'S
## CLAIM FOR MECHANICS LIEN

The Claimant, Brickcraft, Inc., 125 South Wacker Drive, Suite 3010, Chicago, Illinois 60606, (hereinafter "Claimant"), hereby files its General Contractor's Claim for a Mechanics Lien on the Real Estate (as hereinafter described) and against the interest of the following entities: River Village LLC ("Developer"), JS II, LLC ("Owner"), and Bank of America ("Lender").

Claimant states as follows:

1.    On or about September 20, 2001, and subsequently, the Owner owned fee simple title to the Real Estate (including all land and improvements thereon, in Cook County, Illinois commonly known as 3250 South Benson Street and 3330-3350 South Racine, Chicago, Illinois, referred to as Bridgeport Village, and legally described as follows:

Parcel 1:

Lots 1 to 6 in Block 9 in Springer and Fox's Addition to Chicago in the East One-Half of the Northwest quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-108-004-0000

Parcel 2:

Lot 1 in Assessor's Division of the Northwest Quarter and the West One-Half of the Northeast Quarter of Section 32, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

PIN: 17-32-116-023-8001; 17-32-116-023-8002; 17-32-116-025-0000; 17-32-116-024-8001; 17-32-116-024-8002; 17-32-116-022-8001; 17-32-116-022-8002 and 17-32-116-015-8001.

2.    The claimant, as General Contractor, and River Village LLC, as agent for the owner or, alternatively with the knowledge and consent of the Owner entered into a contract dated September 20, 2001, under which the Claimant agreed to provide labor and materials for the furnishing and building of certain improvements, including common area masonry labor and materials for the original contract price of $46,300.00.

3.    Claimant substantially completed the work at the Real Estate on or about May 4, 2002.

4.    As of the date hereof, after all credits due and owing to the Owner and its Agents, there remains due and owing to Claimant, as to the above identified units the sum of $46,300.00 which amount bears interest from and after May 4, 2002 at the statutory rate. Claimant claims a lien on the Real Estate in the amount of $46,300.00 plus interest.

Dated this ____ Day of _____, 2002.

                                    BRICKCRAFT, INC.


                                    By: _____
                                              Its General Counsel

LKARLIN\495509.1

## VERIFICATION

STATE OF ILLINOIS      }
                       } ss.
COUNTY OF COOK         }

     Lawrence M. Karlin being first duly sworn on oath, states that he is the general counsel for Claimant Brickcraft, Inc. an Illinois corporation, and that he is authorized to sign this verification to the foregoing General Contractor's Claim for Mechanics Lien, that he has read the foregoing and that the statements therein contained are true to the best of his information and belief.

                                                Lawrence M. Karlin

Subscribed and Sworn to before me
this ___ day of _____ 2002.

_____
      Notary Public

        "OFFICIAL SEAL"
     MARILYN M. CHAUNCEY
      Notary Public, State of Illinois
      My Commission Exp. 0?/?? 20??

LKARLIN493509.1

02/15/2008 10:59 6303234214 ADAMS&ASSOC. PAGE 24

# ago Tribune

**Sunday**
June 3, 2007

For breaking news and more, go to chicagotribune.com

CHICAGOLAND FINAL

**TRIBUNE INVESTIGATION**

# Clout helped build flawed luxury homes

## City missed defects in Bridgeport Village plans



Tribune photo by Zbigniew Bzdak

**By Laurie Cohen
and Todd Lighty**
*Tribune staff reporters*

Four years ago, a gusty wind raced through a luxury housing development near the Chicago River, tearing apart a two-story home in the later stages of construction.

The debris was quickly swept away, and the project—the largest development of single-family homes in the city—went on to win awards and attract more than 100 buyers, some of whom paid more than $1 million for their homes.

But the 2003 collapse eventually led to the conclusion that the buildings had structural problems so severe that they needed to be supported by towering steel braces between the homes—an unprecedented engineering fix designed to prevent their wood frames from twisting in strong winds.

Many residents are wondering why the city allowed such flawed houses to be built in the first place and why the defects did not come to light sooner.

The answer, pieced together through interviews, court records and city documents obtained by the Tribune through the Illinois Freedom of Information Act, involves the familiar Chicago mix of political clout and lax oversight.

The homes are in Mayor Richard Daley's native Bridgeport neighborhood in the 11th Ward and their creation features a cast of political heavy-hitters with close ties to the mayor. Daley himself took an unusual interest, at one point asking his aides for a list of those buying homes in the project, known as Bridgeport Village.

The project was monitored by an understaffed Buildings Department that paid little attention to single-family home construction, especially when it came to making sure a politically connected development complied with the building code.

When the city quietly approved the plan for 15-foot-high braces without notifying residents, officials made it clear that the decision was

02/15/2008  10:59  6383234214          ADAMS&ASSOC.                                    PAGE  25



Tribune photo by Zbigniew Bzdak



J.S. Bruederle examines one of the braces mounted between his home and that of his neighbor in Bridgeport Village.

The collapse of one of the Bridgeport Village homes during a 2003 storm, seen here in a photo by Robert Splendoria, triggered concerns.

vent their wood frames from twisting in strong winds.

Many residents are wondering why the city allowed such flawed houses to be built in the first place and why the defects did not come to light sooner.

The answer, pieced together through interviews, court records and city documents obtained by the Tribune through the Illinois Freedom of Information Act, involves the familiar Chicago mix of political clout and lax oversight.

The homes are in Mayor Richard Daley's native Bridgeport neighborhood in the 11th Ward and their creation features a cast of political heavy-hitters with close ties to the mayor. Daley himself took an unusual interest, at one point asking his aides for a list of those buying homes in the project, known as Bridgeport Village.

The project was monitored by an understaffed Buildings Department that paid little attention to single-family home construction, especially when it came to making sure a politically connected development complied with the building code.

When the city quietly approved the plan for 15-foot-high braces—without notifying homeowners—officials made it clear that the decision was aimed at shielding the mayor from embarrassment.

"We are concerned above all with the safety of all the citizens and . . . also to protect our mayor," John Argrela, then chairman of the Building Board of Appeals, said at an April 4, 2006, meeting. "I mean, we don't want anything to look bad in the eyes

PLEASE SEE **HOMES**, PAGE 7

# Army in retreat over 'stop loss'

## Military told to limit unpopular policy

**By Kirsten Scharnberg**
Tribune national correspondent

As the U.S. moves into its fifth year in Iraq and escalates troop levels there, the Pentagon has kept combat units manned by forcing as many as 80,000 soldiers to stay in uniform and in war zones even after their enlistment obligations have been met or their retirement dates have passed.

The policy, known as "stop loss" and utilized more during the war in Iraq than ever before, has sparked such a spate of lawsuits and backlash in the ranks that Defense Secretary Robert Gates has ordered all branches of the services to formulate plans to minimize use of the unpopular policy while still maintaining combat readiness.

The policy practically speaking, means that a soldier who signs up for four years can expect to be held on the job five years or more if his unit is deploying. In addition, those who have completed 20 years of service—the time previously required for unquestioned retirement with full benefits—increasingly have seen their applications for retirement denied. And the vast majority of those troops find that stop loss means one thing: Instead of beginning new lives in the civilian world, they are headed back to Iraq for their second, third or even fourth combat tours, a practice critics say amounts to nothing less than an involuntary draft.

"I know a lot of people like to call it a 'back-door draft,'" said

PLEASE SEE **STOP LOSS**, PAGE 13

## INSIDE

### NATION

**FBI accuses 4 in airport terror plot**

The alleged plan: Destroy JFK by blowing up its fuel lines. PAGE 8

Weather Showers; high 77
Index, Page 2



02/15/2008  10:59   6303234214              ADAMS&ASSOC.                    PAGE 25

CHICAGO TRIBUNE

## TRIBUNE INVESTIGATION



Tribune photo by José M. Osorio
Jose and Sandra Ruiz bought an $875,000 home in Bridgeport Village more than a year ago that they still can't occupy because of structural defects.

## HOMES:
## Residents say the city dropped ball

CONTINUED FROM PAGE 1

of the public that, you know, these things are done."

The Daley administration already had been hit by a series of building-related scandals, including the collapse of a Lincoln Park porch that killed 13 people and the hiring of a teenage building inspector whose father was a top union official. Since late last year, 10 city employees have been charged with taking bribes or lying in connection with building permits and inspections.

City officials said that the houses are in no danger of falling down and that the braces were designed for improbably high wind speeds. Officials said homeowners were not immediately notified of the need for braces because they are common elements of the development, which individual residents do not own.

Residents aren't satisfied with the way the city handled the project.

"The city missed everything that was going up," said Bridgeport Village resident J.B. Bruederle, a veterinarian. "They just dropped the ball."

Others worry that bad publicity could hurt the value of their homes.

But the publicity has come anyway. The development filed for bankruptcy in March, saying it needed protection from creditors while it sells nearby industrial property so it can raise money to repair the homes. One of the partners, Thomas Snitzer, alleged in a federal lawsuit that the city forced him out as manager because he refused to give favors and kickbacks to 11th Ward operatives.

### Cast at ground floor

Early on, the development appeared to be stalled.

The partners were no lightweights: John Kinsella, a longtime Daley supporter and former chief executive of the advertising agency Leo Burnett; Timothy Desmond, a former candymaker; and Snitzer, a real estate developer.

Still, they didn't have the City Hall access they needed. Ald. James Balcer (11th), whose blessing was required for the project to proceed, had refused for a year to even discuss it, according to Snitzer's suit.

Court documents now show that the project's dealings with the city began to click after Kinsella brought in as an adviser Timothy Degnan, an 11th Warder and former top aide to the mayor, to steer the project through official channels. Degnan's business associate, Thomas DiPiazza, was hired as a consultant, to be paid up to

along with it."

Levy said he could not remember exactly what DiPiazza said, but the meaning was clear.

"He said something to the effect that, you know, 'Life would be difficult for you.' In Chicago parlance, that's, you know, I think most people know what that means," Levy said.

Soon afterward, Levy got a letter from the city saying it intended to condemn his land. Then a team of building inspectors arrived at a nearby warehouse that Levy owns and cited him for 169 building code violations—many of which applied to residential, not industrial buildings, a judge later found.

The city ultimately withdrew its condemnation plan and did not fine Levy for the violations. Levy did not agree to sell his property.

Neither Levy, nor DiPiazza nor Degnan would comment on the incident.

—Todd Lighty and Laurie

of the public that, you know, these things are done.

The consultant, Thomas DiPiazza, was a longtime associate of Timothy Degnan, a former top aide to Mayor Richard Daley. DiPiazza told Levy that Degnan was involved in Bridgeport Village and that it would be a good idea for Levy to sell.

"I think what was said is that Tim Degnan is involved [as] a partner in this deal. And everyone knows who Tim Degnan is," Levy said in a sworn statement in a lawsuit. "I think it might be said there was a possibility that this could be arranged for a



Source: City records

Parking lot owned by Paul Levy that Bridgeport Village developers wanted to acquire

Chicago Tribune

## Landowner's decision made his life 'difficult'

Paul Levy found out what City Hall could do to those who stood in the way of plans for Bridgeport Village.

Levy owns a parking lot adjacent to the project, and the developers wanted his land, too. But Levy didn't want to sell.

In a meeting that Levy later described as "disturbing," a consultant for the project tried to persuade him to change his mind.

Commissioner Stan Kaderbek, giving him the Jacobson report and photos of the wind-damaged homes. Kaderbek, a structural engineer, immediately called in consultants at Wiss, Janney, Elstner Associates to review the plans for Bridgeport Village.

The consultants agreed with Jacobson that the homes did not meet code. The firm recommended in May 2005 that the homes be reinforced within a year. But Kaderbek did not mention structural stability when he met with Bridgeport Village homeowners to announce that the new management team, led by Kinsella, had signed an agreement with the city to fix all problems. Instead, he said there were "serviceability issues" with some of the houses that could be fixed with a "low cost, minimal impact solution," according to a copy of his statement.

Kaderbek, who is a defendant in Snitzer's suit, declined to comment, but his lawyer, Mark Rotert, said in an e-mail that Kaderbek "acted properly in all respects."

### A quick fix

Ralph Schmidt, an engineer who, under Kaderbek's direction, came up with a plan to fix the buildings, installed between the homes, anchored in concrete and attached by steel bars at the second floor. Schmidt has told homeowners that such braces have not been used before but are similar to stone buttresses used centuries ago. Even with the braces, the plan did not meet the building code. It had to go before the Building Board of Appeals, a little-known agency that reviews requests to build in ways that don't comply with city law. At the meeting in April 2005, the main spokesman for the project was lawyer Jack George, whose partner at the firm of Daley &

02/15/2008  18:59    6303234214    ADAMS&ASSOC.    PAGE  27

Paul Levy found out what City Hall could do to those who stood in the way of plans for Bridgeport Village.

Levy owns a parking lot adjacent to the project, and the developers wanted his land, too. But Levy didn't want to sell.

In a meeting that Levy later described as a "disturbing," a "consultant for" the project tried to persuade him to change his mind.

The consultant, Thomas DiPiazza, was a longtime associate of Timothy Degnan, a former top aide to Mayor Richard Daley. DiPiazza told Levy that Degnan was involved in Bridgeport Village and that it would be a good idea for Levy to sell.

"I think what was said is that Tim Degnan is involved [as] a partner in this deal. And everyone knows who Tim Degnan is," Levy said in a sworn statement in a lawsuit. "I think it might be said there was a possibility that this could be arranged for a condemnation if we didn't go

along with it."

Levy said he could not remember exactly what DiPiazza said, but the meaning was clear.

"He said something to the effect that, you know, 'Life would be difficult for you.' In Chicago parlance, that's, you know, I think most people know what that means," Levy stated.

Soon afterward, Levy got a letter from the city saying it intended to condemn his land. Then a team of building inspectors arrived at a nearby warehouse that Levy owns and cited him for 159 building code violations—many of which applied to residential, not industrial buildings, a judge later found.

The city ultimately withdrew its condemnation plan and did not fine Levy for the violations. Levy did not agree to sell his property.

Neither Levy nor DiPiazza nor Degnan would comment on the incident.

—*Todd Lighty and Laurie Cohen*

## Clout at ground floor

Early on, the development appeared to be stalled.

The partners were no lightweights: John Kinsella, a longtime Daley supporter and former chief executive of the advertising agency Leo Burnett; Sidney Diamond, a novelty candymaker; and Snitzer, a real estate developer.

Still, they didn't have the City Hall access they needed. Ald. James Balcer (11th), whose blessing was required for the project to proceed, had refused for a year to even discuss it, according to Snitzer's suit.

Court documents now show that the project's dealings with the city began to click after Kinsella brought in as an adviser Timothy Degnan, an 11th Warder and former top aide to the mayor, to steer the project through official channels. Degnan's business associate, Thomas DiPiazza, was hired as a consultant, to be paid up to $1.3 million.

According to Snitzer's suit, Degnan, DiPiazza and Kinsella attended a 1999 meeting at City Hall to talk about plans for the project with Balcer, Daley and the mayor's brother John, the 11th Ward committeeman and Cook County commissioner.

At the meeting, the mayor pledged to have the official in charge of the sale of city-owned land expedite the project, the suit says.

Jodi Kawada, a spokeswoman for Daley, said the city had no record of the meeting, but added that "the mayor frequently attends planning meetings that cover a range of developments all over the city."

Kawada said the mayor did not ask that the sale of the land be expedited.

City records show that the mayor's office kept tabs on the project's progress. In May 2001, Sheila O'Grady, then Daley's chief of staff, asked the building commissioner for an update on the status of the development's permits.

Many of the proposed homes were as narrow as Chicago's squat brick bungalows—20 feet wide—but were taller and had wood frames. Their first floors had large windows and open floor plans.

Despite the updated design, the city did not make sure the architectural plans for the houses met structural engineering requirements, including the ability to endure winds without swaying. Unlike many suburban communities, Chicago does not typically do structural reviews for single-family homes. The city says it puts its resources elsewhere because homes have a relatively small risk of structural failure. Since 2004, city officials said, plans for

big housing developments get structural reviews from outside architectural and engineering firms.

As building got under way, problems began cropping up. Inspectors placed stop-work orders on 70 homes that did not have building permits. But for reasons that are unclear, the city allowed the work to continue.

Homes sold rapidly, and the project was hailed as a symbol of rejuvenation for blue-collar Bridgeport. It attracted buyers from across the city, including doctors, lawyers, former Chicago Bear Chris Zorich and former Daley aide Victor Reyes.

But problems kept coming.

## Storm damage

On May 11, 2002, a storm blew over one partially built house and caused another to shift on its foundation. Anthony Splendoria, a subcontractor who left the project in a dispute over payment to his Brickcraft masonry company, noticed the damage and hired a structural engineering firm to review plans for the homes.

Stuart K. Jacobson & Associates concluded that the design did not have enough rigid walls to withstand the wind.

"We thought it was a serious issue," Jacobson said in an interview. "We believed the buildings to be structurally deficient as shown on the drawings."

The engineers found that wind pressure could cause "racking," a gradual twisting of the frame that can cause cracks in the masonry and drywall and dislodge windows and doors, leading to chronic leaks. In extreme cases, the buildings

might collapse.

After receiving the report, Splendoria and his brother Robert say, they became concerned about the safety of the houses.

"The houses were safe as long as it was not too windy," Robert Splendoria said.

For the next two years, the Splendorias crusaded to get the developers to respond to Jacobson's report, but their efforts went nowhere.

Snitzer hired engineers who vouched for the structural soundness of the homes, and the project architect said changes in the field during construction had strengthened the walls.

After years of allowing construction to proceed despite code violations, City Hall finally brought work on the project to a halt in 2005. To make sure that all work really stopped, the mayor told his aides to post an inspector at the project all day and bill the developer, city records show.

The reasons for the city's long-delayed move are in dispute. City officials said they halted work and helped persuade a state court judge to remove Snitzer as manager because they were getting complaints from homeowners and Snitzer was not moving quickly enough to fix problems.

Snitzer, in his federal suit, says the city cracked down after he refused DiPiazza's demands to pay him more money and to stop powerful real estate that 11th Ward power brokers had intended for others.

But the city still hadn't figured out that there were structural problems.

On May 9, 2005, the Splendorias met with then-Building

commissioner, the city to fix problems, said Radarbek, who is a defendant in Snitzer's suit, declined to comment, but his lawyer, Mark Rotert, said in an e-mail that Radarbek "acted properly in all respects."

## A quick fix

Ralph Schmidt, an engineer hired by the project as the city's direction, came up with a plan to fix the buildings: braces installed between the homes, anchored to concrete and attached by steel bars at the second floor. Schmidt has told homeowners that such braces have not been used before but are similar to stone buttresses used centuries ago. Even with the braces, the plan did not meet the building code. It had to go before the Building Board of Appeals, a little-known agency that reviews requests to build in ways that don't comply with city law. At the meeting in April 2005, the main spokesman for the project was lawyer Jack George, whose partner at the firm of Daley & George is the mayor's brother Michael.

Approval was never in doubt, with Balcer and a handful of other city officials on hand to give support. The residents, who by that time had occupied 98 homes, were not told of the need for the braces until three weeks later.

Kinsella has since acknowledged that the braces are the cheapest solution and the only one he would pay for. So far only a handful have been installed.

Kinsella refers to the braces as "gates" because they are designed with ornamental gates at the bottom.

In meetings with residents, Kinsella has acknowledged water leaks in many homes but said they were caused by construction flaws relating to windows and roofs and not by structural defects.

As part of the deal that allowed construction to continue, the developers had agreed to get certificates of occupancy for each home to show it met code. Usually such certificates are not required for single-family homes in Chicago.

But Jose and Sandra Ruiz, who live in Bridgeport Village, were sold a larger home there in March 2006 even though it had no certificate of occupancy.

They have not moved in because of a series of problems: buckled floors, leaky windows and, doors, an unconnected sewer line and a wood frame that was not attached to the concrete foundation. They blame the city for not alerting them to structural flaws.

"When we make an investment in something like this, we rely on the city to protect us," Jose Ruiz said.

*lcohen@tribune.com*
*tlighty@tribune.com*

# Exhibit B

# UNITED STATES BANKRUPTCY COURT

For the **Northern** _____ District of **Illinois** _____

This is to certify that the within and attached document(s) is a full, true and correct copy of the original thereof as the same appears on file in the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois.

Kenneth S. Gardner
Clerk of Court

By: **Evelyn Gutierrez** _____
Deputy Clerk

Dated: **March 4, 2008** _____

This is to certify that the within and attached document is a full, true and correct copy of the original thereof as the same appears on file in the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois.

KENNETH S. GARDNER
CLERK OF COURT

By _____
Deputy Clerk

Dated MAR 04 2008