**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No 08 C 1425 |
| J.S. II, L.L.C., et al, | ) | Hon. Virginia M. Kendall |
| | ) | |
| Debtors. | ) | Mag. Judge Michael T. Mason |
| | ) | |
| | ) | |
| J.S. II, L.L.C., RIVER VILLAGE I, L.L.C., RIVER | ) | |
| VILLAGE WEST, L.L.C., AND KND | ) | |
| INVESTMENTS, L.L.C., , | ) | Originally brought in |
| | ) | |
| | ) | Chapter11 |
| Plaintiffs, | ) | Case No. 07-11565 |
| | ) | (Jointly Administered) |
| v. | ) | Hon. Jacqueline P. Cox |
| | ) | Adv. No. 08-00072 |
| BRICKCRAFT, INC., ANTHONY SPLENDORIA | ) | |
| AND ROBERT SPLENDORIA, | ) | |
| | ) | |
| Defendants. | ) | |

## ANTHONY SPLENDORIA'S ANSWER AND AFFIRMATIVE DEFENSES TO COUNTS I AND II OF THE ADVERSARY COMPLAINT

Defendant Anthony Splendoria ("Defendant"), by its attorneys, Robert Radasevich and Jennifer Lee), respectfully files this answer and affirmative defenses to Counts I and II of the Adversary Complaint filed by the plaintiffs J.S. II, L.L.C. ("JS II"), River Village I, L.L.C. ("River Village"), River Village West, L.L.C. ("River Village West"), and KND Investments, L.L.C. ("KND," and together with JS II, River Village I, River Village West, "Plaintiffs" or "Debtors").

## INTRODUCTION

This action involves the malicious, intentional and willful misconduct by Brickcraft and the Splendoria Brothers, who have done everything in their power to defame the Plaintiffs'

business and tortiously interfere with the Plaintiffs' economic relationships with Bank of America and the homeowners of Bridgeport Village. With recklessness, actual malice and intent to do harm, Brickcraft and the Splendoria Brothers decided to tell anyone who would listen, as well as those who were not interested in their specious tales, that the Plaintiffs had committed fraud and that the houses being built in Bridgeport Village were structurally unsafe and could immediately collapse. Brickcraft and the Splendoria Brothers made such defamatory statements without doing a thorough investigation of the relevant facts and by simply ignoring other facts. Their tortious conduct has resulted in the Plaintiffs incurring damages in excess of $1 million. Such conduct, moreover, was inequitable and should not be rewarded through the allowance of distributions from the Plaintiffs' estate to Brickcraft prior to distributions being made to all other secured and unsecured creditors of the estate.

## <u>JURISDICTION AND VENUE</u>

1.      On March 5, 2007 (the "Petition Date"), Plaintiffs filed related petitions for relief under Chapter 11 of the Bankruptcy Code thereby commencing the above-referenced cases (the "Cases"). As debtors in possession, the Debtors have substantially all of the rights, powers and duties of a trustee appointed under chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1107(a).

**<u>ANSWER:</u>**    Defendant admits the averments contained in paragraph 1 of the Adversary Complaint.

2.      This Court has exclusive jurisdiction over all of the Debtors' property, wherever located, pursuant to 28 U.S.C. § 1334(e).

**<u>ANSWER:</u>**    Defendant admits the averments contained in paragraph 2 of the Adversary Complaint.

3.      On or abut June 1, 2007, Brickcraft filed its Proof of Claim against Debtors alleging that it was a secured creditor and seeking approximately $240,000 from the estate.

**<u>ANSWER:</u>**    Defendant admits the averments contained in paragraph 3 of the Adversary Complaint.

4.    The claims in this Adversary Complaint arise in and relate to the Cases. Therefore, this Court has subject matter jurisdiction over this Adversary Complaint pursuant to 28 U.S.C. §§ 157(a) and (b) and 28 U.S.C. § 1334(b).

**ANSWER:**    Defendant admits the averments contained in paragraph 4 of the Adversary Complaint.

5.    This Court has core jurisdiction to hear and determine the Debtors' claims against Brickcraft because the claims are counterclaims to Brickcraft's Proof of Claim.

**ANSWER:**    Defendant admits that Count III asserts a core claim against Brickcraft, but denies the remaining averments in paragraph 5 of the Adversary Complaint.

6.    This Court has "related to" jurisdiction to hear the claims against the Splendoria Brothers because they are related to the claims against Brickcraft, the claims are property of the Debtors' estates and the claims are related to the Debtors' Cases.

**ANSWER:**    Defendant admits the averments contained in paragraph 6 of the Adversary Complaint.

7.    As to the counts in this Adversary Complaint that are "non-core," the Plaintiffs consent to the entry of final orders or judgment by the Bankruptcy Court.

**ANSWER:**    Defendant admits the averments contained in paragraph 7 of the Adversary Complaint.  Further answering, Defendant does not consent to the entry of final orders of judgments by the Bankruptcy Court as to the Counts in the Adversary Complaint that are "non-core".

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) as this Adversary Complaint is brought in the Debtors' chapter 11 Cases that are pending in this judicial district.

**ANSWER:**    Defendant admits the averments contained in paragraph 8 of the Adversary Complaint.

## ALLEGATIONS COMMON TO ALL COUNTS

A.    **The Parties**

9.    Debtor JS II is an Illinois limited liability company and the owner of a major residential real estate project along the Chicago River in the Bridgeport neighborhood of

- 3 -

Chicago known as Bridgeport Village, as well as other nearby parcels acquired for future development.

**ANSWER:**    Defendant admits that JS II is an Illinois limited liability company and the owner of a residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago known as Bridgeport Village.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in paragraph 9 of the Adversary Complaint.

10.    Debtor River Village is an Illinois limited liability company.

**ANSWER:**    Defendant admits the averments contained in paragraph 10 of the Adversary Complaint.

11.    Debtor River Village West is an Illinois limited liability.

**ANSWER:**    Defendant admits the averments contained in paragraph 11 of the Adversary Complaint.

12.    Brickcraft is an Illinois corporation with its principal place of business in Willowbrook, Illinois.

**ANSWER:**    Defendant admits the averments contained in paragraph 12 of the Adversary Complaint.

13.    A. Splendoria is the president of Brickcraft, and is a resident of Willowbrook, Illinois.

**ANSWER:**    Defendant admits the averments contained in paragraph 12 of the Adversary Complaint.

14.    R. Splendoria is, on information and belief, an officer of Brickcraft, and is a resident of Downers Grove, Illinois.

**ANSWER:**    Defendant admits that Robert Splendoria is a resident of Downers Grove, Illinois.

Defendant denies the remaining averments in paragraph 14 of the Adversary Complaint.

**B.      The Project**

15.      The Plaintiffs were formed to acquire, develop, and sell various real estate parcels along the Chicago River in the Bridgeport neighborhood of Chicago.

**ANSWER:**      Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 15 of the Adversary Complaint.

16.      In a series of transactions, Plaintiffs acquired approximately 31 acres of industrial property in the Bridgeport neighborhood of Chicago.

**ANSWER:**      Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 16 of the Adversary Complaint.

17.      Plaintiffs intended to convert the acquired parcels to residential use and to develop, construct and sell residences to the public.

**ANSWER:**      Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 17 of the Adversary Complaint.

18.      Plaintiffs intended to develop the overall project in several phases, with the total build-out and sale of residences to be over 400 residences.

**ANSWER:**      Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 18 of the Adversary Complaint.

19.      Phase I of the project involved approximately 11 acres located near 33rd Street and Racine in Chicago, Illinois.

**ANSWER:**      Defendant admits the averments in paragraph 19 of the Adversary Complaint.

20.      As approved by the Department of Planning and Development, Phase I of the project consisted of the development of approximately 115 single-family homes.

**ANSWER:**      Defendant admits the averments in paragraph 20 of the Adversary Complaint.

21.      The Plaintiffs refer to Phase I of the project as "Bridgeport Village" or the "Bridgeport Village Project" or "BPV."

**ANSWER:**      Defendant admits the averments in paragraph 21 of the Adversary Complaint.

### C.    Brickcraft's work at Bridgeport Village

22.    The Bridgeport Village Project, with 115 intended homes, was one of the largest residential development projects in Chicago in recent years.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to

the truth of the averments in paragraph 22 of the Adversary Complaint.

23.    River Village retained Brickcraft to perform outside masonry veneer work on approximately seven homes in Bridgeport Village. Masonry veneer serves as the "outer skin" of a home. According to Brickcraft, Brickcraft substantially completed its work on the project in early May, 2002.

**ANSWER:**    Defendant admits the averments in paragraph 23 of the Adversary Complaint.

24.    Notably, Brickcraft did not perform any type of work that related to or impacted the structural stability of any of the homes in Bridgeport Village nor did it have any firsthand knowledge of the actual construction of any of the homes.

**ANSWER:**    Defendant admits that it did not perform any type of work that related to or

impacted the structural stability of the homes in Bridgeport Village.  Defendant denies the

remaining averments in paragraph 24 of the Adversary Complaint.

25.    As of the time that Brickcraft completed its work on the project, Brickcraft claimed that the Plaintiffs still owed Brickcraft approximately $150,000.

**ANSWER:**    Defendant admits the averments in paragraph 25 of the Adversary Complaint.

### D.    Brickcraft demands payment from the Plaintiffs

26.    On or about May 14, 2002, and within days of allegedly completing its work on the project and without giving the Plaintiffs any prior notice, Brickcraft filed seven separate mechanics liens against the Bridgeport Village Property, and thereby began its campaign to pressure the Plaintiffs to pay immediately all sums that Brickcraft believed were due and owing.

**ANSWER:**    Defendant admits that upon completion of its work on seven models in Bridgeport

Village, Brickcraft filed seven separate mechanics liens against the Bridgeport Village Property

and sought payment of the sums due and owing to it from River Village.  Defendant denies the

remaining averments in paragraph 26 of the Adversary Complaint.

27.    On May 21, 2002, Brickcraft notified the Plaintiffs' principal lender, Bank of America ("BOA") of the filing of the mechanics liens. In March 2003, Brickcraft decided to turn up the heat on the Plaintiffs by beginning a letter writing campaign to BOA and demanding that BOA pay Brickcraft for the outstanding balance allegedly owed to it. Indeed, between March 14, 2003 and May 2, 2003, Brickcraft wrote BOA at least nine separate letters and, on information and belief, attempted to speak directly with officers of BOA on other occasions. Brickcraft continued to harass BOA even after BOA directed Brickcraft to resolve its issues directly with the Plaintiffs.

**ANSWER:**    Defendant admits the averments contained in the first sentence of paragraph 27 of the Adversary Complaint.  Defendant admits that Brickcraft sent letters to Bank of America and attempted to speak with Bank of America representatives directly regarding satisfaction of its mechanics lien claims against the Bridgeport Village project.  Defendant denies the remaining averments in paragraph 27 of the Adversary Complaint.

### E.    Two lots suffer some damages from a wind storm

28.    On or about May 11, 2003, high winds accompanied a storm that blew through the Chicagoland area. During that storm, homes that were in the process of being built on two lots (Lot #17 and Lot #51) in the project sustained some damage. Brickcraft and the Splendoria Brothers, who were undoubtedly looking for another avenue by which to pressure the Plaintiffs, seized upon this event and began what can only be described as a vindictive "crusade" designed to bring down the Plaintiffs at any and all costs.

**ANSWER:**    Defendant admits the averments contained in the first two sentences of paragraph 28 of the Adversary Complaint.  Defendant denies the remaining averments in paragraph 28 of the Adversary Complaint.

29.    Without performing any investigation whatsoever into the damage done to the "yet to be completed" homes, Brickcraft and the Splendoria Brothers immediately began writing letters and making other attempts to contact the Plaintiffs' principal lender, BOA. Brickcraft and the Splendoria Brothers presented BOA with a one-sided, uninformed story of the damage done on Lots 17 and 51, and then encouraged BOA to get involved because of Brickcraft's alleged concerns of the quality of the construction work. Brickcraft's and the Splendoria Brothers' harassment of BOA was constant, as they made a half dozen communications with BOA during the last half of May 2003. Brickcraft had not performed any work on Lots 17 and 51, and neither Brickcraft nor the Splendoria Brothers had any knowledge of the state of the construction of the homes on those lots prior to the time of the windstorm.

**ANSWER:**    Defendant admits that Brickcraft had not performed any work on the homes being

constructed on Lots 17 and 51 in the Bridgeport Village Project.  Defendant admits that after one

of the homes being constructed in Bridgeport Village was blown down and another sustained

significant wind damage during the storm on May 11, 2003, Brickcraft attempted to contact

Bank of America to express its concerns regarding the structural integrity of the homes being

constructed in Bridgeport Village. Defendant denies the remaining averments in paragraph 29 of

the Adversary Complaint.

30.    Moreover, even after BOA again told Brickcraft and the Splendoria Brothers to
address their issues with the Plaintiffs, Brickcraft and the Splendoria Brothers continued to
harass BOA. The harassment included letters being sent directly to BOA's Chief Financial
Officer, among BOA's other officers.

**ANSWER:**    Defendant admits that Brickcraft sent letters to Bank of America including to

Bank of America's Chief Financial Officer to express concern over the structural integrity of the

homes being constructed in Bridgeport Village. Defendant denies the remaining averments in

paragraph 30 of the Adversary Complaint.

**F.    The Two Jacobson Reports**

31.    Without speaking with the Plaintiffs or doing any substantive investigation,
Brickcraft hired Stuart K. Jacobson & Associates, Ltd. ("Jacobson") to prepare a report
speculating on the structural integrity of the homes being built at Bridgeport Village. Brickcraft
provided Jacobson with only the architectural drawings dated June 4, 2001 for the "Federal" and
"Lincoln Park" Models. Consequently, without any onsite inspection of any of the Bridgeport
Village homes, any report prepared by Jacobson would necessarily contain several assumptions
about the construction of the homes.

**ANSWER:**    Defendant admits that Brickcraft retained the engineering firm of Stuart K.

Jacobson & Associates, Ltd. to prepare a report regarding certain aspects of the structural

integrity of the homes as designed at the Bridgeport Village Project to determine the potential

effect structural deficiencies might have on the long term serviceability and integrity of the

masonry.  Defendant admits that Brickcraft provided Jacobson with architectural drawings for

two of the models on which Brickcraft rendered services.  Defendant denies the remaining averments in paragraph 31 of the Adversary Complaint

32.    On or about June 24, 2003, Harry Allen of Jacobson submitted his first report to Brickcraft (the "June 24 Report"). While the June 24 Report alleged, based on numerous assumptions, that the lateral load resistance in some of the homes in Bridgeport Village did not meet the requirements of the Chicago Building Code, there were no concerns contained in the June 24 Report that the homes were in any danger of collapsing.

**ANSWER:**    Defendant admits that on June 24, 2003, Harry Allen of Jacobson presented Brickcraft with certain preliminary findings.  Defendant admits that the June 24 preliminary findings indicated that the lateral load resistance in some of the homes in Bridgeport Village did not meet the requirements of the Chicago Building Code.  Defendant admits that the June 24 preliminary findings did not state that the homes were in any danger of collapsing.  Defendant denies the remaining averments in paragraph 32 of the Adversary Complaint. Defendant admits that Brickcraft supplied additional information to Jacobson subsequent to the June 24, 2003. Defendant denies that Harry Allen or anyone else at Jacobson presented Brickcraft with a signed engineering report on June 23, 2004.

33.    Subsequent to the June 24 Report, Brickcraft and the Splendoria Brothers provided more assumptions to Jacobson and asked Jacobson to prepare another report. The additional assumptions only served to *increase* the strength of the lateral load resistance systems in the homes. Based on these additional assumptions, Harry Allen of Jacobson prepared a second report dated July 15, 2003 (the "July 15 Report"). In contrast to the June 24 Report, Harry Allen wrote in the July 15 Report that the shear walls supporting the homes were grossly inadequate and that it was "not inconceivable" that a "major failure of the lateral wind resisting system could occur" and cause a "partial or full collapse" of the homes. Placing this language in the July 15 Report was not Allen's idea.

**ANSWER:**    Defendant admits that Brickcraft supplied additional information to Jacobson subsequent to the June 24, 2003 preliminary findings.  Defendant admits that it received a report from Jacobson signed by Harry Allen and dated July 15, 2003.  Defendant admits that the language quoted in paragraph 33 of the Adversary Complaint is taken verbatim from the July 15 report and that said quoted language does not appear in the June 24 preliminary findings.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in the last sentence in paragraph 33 of the Adversary Complaint.

34.    With the unsubstantiated July 15 Report in hand and the risk of "collapse" language contained therein, Brickcraft and the Splendoria Brothers now had all the ammunition they needed to go after the Plaintiffs, and they did so with a vengeance.

**ANSWER:**    Defendant denies the averments contained in paragraph 34 of the Adversary Complaint.

35.    Indeed, beginning in August 2003, Brickcraft and the Splendoria Brothers sent the flawed July 15 Report to the Plaintiffs and began demanding the Plaintiffs' immediate response to the report. At the same time, Brickcraft continued its efforts to get paid for the outstanding sums it believed were owed to them.

**ANSWER:**    Defendant admits that Brickcraft sent a copy of the July 15 Jacobson report to River Village.  Defendant admits that Brickcraft requested payment of its outstanding invoices from River Village, but denies that it ever used disclosure of the structural deficiencies in the homes as leverage to receive payment.  Defendant denies the remaining averments in paragraph 35 of the Adversary Complaint.

36.    In January 2004, having not received the outstanding sums allegedly due for its work on the Project and having also not received what they believed to be a sufficient response from the Plaintiffs to the July 15 Report, Brickcraft and the Splendoria Brothers began sending self-serving letter after self-serving letter threatening to take the flawed July 15 Report and their claims to the City and/or the homeowners at Bridgeport Village. Indeed, the letters to the Plaintiffs (or to the Plaintiffs' counsel) began in January 2004 and did not stop.

**ANSWER:**    Defendant admits that by January 2004, Brickcraft had not been paid in full for work done on the Bridgeport Village project and Brickcraft had not received a satisfactory response from the plaintiffs regarding the matters set forth in the July 15 Jacobson report, but denies that it ever used disclosure of the structural deficiencies in the homes as leverage to receive payment.  Defendant admits that Brickcraft sent letters and faxes to River Village and its counsel well before January 2004 and continuing thereafter regarding the July 15 Jacobson

report and the amounts remaining due and owing to Brickcraft.  Defendant denies the remaining

averments in paragraph 36 of the Adversary Complaint.

37.    In May 2004, Brickcraft and the Splendoria Brothers decided to harass BOA yet again, as it began sending letters, including the July 15 Report, to BOA's Board of Directors and Chief Executive Officer, among others, seeking to tarnish the Plaintiffs' relationship with its principal lender. Brickcraft and the Splendoria Brothers, moreover, spared no hyperbole in its letters to BOA. Keeping in mind that they had still ***not*** performed any thorough investigation of the structural integrity of the homes and were aware that many of the assumptions in the report were not accurate, the letters sent to BOA included their alleged "concerns" that families in the homes could be hurt, as if the homes were at risk of collapsing. The truth, according to both Harry Allen and Stuart Jacobson, is that the homes in Bridgeport Village were never at any risk of collapsing.

**ANSWER:**    Defendant admits that Brickcraft sent letters and a copy of the July 15 Jacobson

report to Bank of America and Bank of America's representatives.  Defendant admits that in

those communications with the Bank of America, Brickcraft expressed concern for the safety

residents of the Bridgeport Village project.  Defendant denies the remaining averments in

paragraph 37 of the Adversary Complaint.

38.    Brickcraft's and the Splendoria Brothers' dissemination of the July 15 Report to BOA was reckless and done with actual malice against the Plaintiffs. Brickcraft and the Splendoria Brothers knew in May 2004 that the July 15 Report was flawed, as many of the assumptions contained in the July 15 Report were inaccurate. Moreover, Brickcraft and the Splendoria Brothers failed to disclose, much less mention, the existence of the June 24 Report. Still further, Brickcraft and the Splendoria Brothers distributed the July 15 Report against the wishes of Stuart Jacobson and Harry Allen, who did not intend for the report to be provided to third parties without their permission.

**ANSWER:**    Defendant denies the averments in the first two sentences in paragraph 38 of the

Adversary Complaint. Defendant admits that Brickcraft did not disseminate copies of the June 24

preliminary findings report.  Defendant is without knowledge or information sufficient to form a

belief as to the truth of the averments in the fourth sentence in paragraph 38 of the Adversary

Complaint.

39.    BOA again told Brickcraft and the Splendoria Brothers to speak with the Plaintiffs, but BOA's request fell on deaf ears. Brickcraft and the Splendoria Brothers continued to pepper BOA with letters claiming that they had "life safety" concerns. In their July 7, 2004

letter to BOA, Brickcraft and the Splendoria Brothers again threatened to take their alleged concerns to the homeowners.

**ANSWER:**    Defendant admits that at times, Bank of America informed Brickcraft that Brickcraft should take its concerns regarding payment and the structural integrity of the homes in the Bridgeport Village project to River Village. Defendant admits that it informed Bank of America that it would contact the City of Chicago and homeowners in the Bridgeport Village project regarding the July 15 Jacobson report. Defendant denies the remaining averments in paragraph 39 of the Adversary Complaint.

40.    By letter dated July 7, 2004, the Plaintiffs informed Brickcraft and the Splendoria Brothers that their concerns regarding the structural integrity of the homes were not well founded. Brickcraft and the Splendoria Brothers, however, were still not satisfied.

**ANSWER:**    Defendant admits receiving various written communications from River Village and affiliated parties contending that the homes as designed in the Bridgeport Village project were structurally sound.  Defendant admits that Brickcraft was not satisfied with the responses it received from River Village and affiliated parties.

41.    As a result, Brickcraft and the Splendoria Brothers continued to send letter after letter to the Plaintiffs demanding information about the construction of the homes and threatening to go to the homeowners and the City if their demands were not met. While Brickcraft attempted to persuade the Plaintiffs that their concerns were independent of their desire to get paid, Brickcraft continued to seek payment of the outstanding balance allegedly due.

**ANSWER:**    Defendant admits that Brickcraft sent letters to River Village and its counsel on or after July 7, 2004 regarding the July 15 Jacobson report (including providing the July 15 Jacobson report to the City of Chicago and homeowners in the Bridgeport Village project) and the amounts remaining due and owing to Brickcraft, but denies that it ever used disclosure of the structural deficiencies in the homes as leverage to receive payment. Defendant denies the remaining averments contained in paragraph 41 of the Adversary Complaint.

**ANSWER:**

42.     Beginning in August 2004, the letters from Brickcraft and the Splendoria Brothers included more threats to go to the homeowners and/or the City of Chicago if the Plaintiffs did not meet Brickcraft's demands for information.

**ANSWER:**     Defendant admits that Brickcraft sent letters to River Village and its counsel on or after August 2004 regarding the July 15 Jacobson report (including providing the July 15 Jacobson report to the City of Chicago and homeowners in the Bridgeport Village project). Defendant denies the remaining averments contained in paragraph 42 of the Adversary Complaint.

43.     Although they were under no obligation to do so, the Plaintiffs did provide Brickcraft with additional information regarding the structural integrity of the homes, including revised structural drawings. However, the revised structural drawings provided to Brickcraft only led Brickcraft and the Splendoria Brothers to make additional demands for still more information.

**ANSWER:**     Defendant admits that Plaintiffs provided Brickcraft with additional materials contending that the homes were built in accordance with the revised structural drawings. Defendant admits the averments contained in the second sentence in paragraphs 43 of the Adversary Complaint.

44.     When the Plaintiffs did not succumb to Brickcraft's threats and attempts at extorting the Plaintiffs, Brickcraft and the Splendoria Brothers distributed the July 15 Report to the homeowners and, not surprisingly, caused significant and undue angst amongst many of the homeowners.

**ANSWER:**     Defendant admits that Brickcraft provided copies of the July 15 Jacobson report to homeowners in the Bridgeport Village project. Defendant denies the remaining averments in paragraph 44 of the Adversary Complaint.

**G.     Brickcraft Submits the July 15 Report to the City**

45.     In May 2005, Brickcraft and the Splendoria Brothers took their crusade to still another level by informing the City of Chicago of their alleged concerns and providing the City with a copy of the July 15 Report. While Brickcraft conceded to the City that "other opinions of tradesman/professionals in the construction industry may differ from" Brickcraft's view, this acknowledgement did not stop Brickcraft and the Splendoria Brothers from encouraging the City to investigate the Plaintiffs.

**ANSWER:**    Defendant admits that in May, 2005, it provided a copy of the July 15 Jacobson report to the City of Chicago and that the quoted language in paragraph 45 of the Adversary Complaint is taken verbatim from a letter from Brickcraft to the City of Chicago.  Brickcraft admits that it suggested to the City of Chicago that the City look into the structural integrity of the homes in the Bridgeport Village project.  Defendant denies the remaining averments in paragraph 45 of the Adversary Complaint.

46.    In June 2005, Brickcraft and A. Splendoria again "sounded the fire alarm" by telling the City that the Bridgeport Village site was dangerous to children. Brickcraft and A. Splendoria also sent correspondence to the homeowners telling them to get more involved because of ***Brickcraft's*** concerns. In July, 2005 Brickcraft continued to pound the members of the Ad Hoc Homeowners Association Committee with correspondence citing ***Brickcraft's and Splendoria's "life/safety concerns,"*** and threatening to take their allegations directly to all of the homeowners. Brickcraft knew from its ongoing communications with Jacobson that the homes were not at a risk of collapsing. Yet, Brickcraft and the Splendoria Brothers continued to distribute the report recklessly without regard to the actual truth.

**ANSWER:**    Defendant admits that Brickcraft sent correspondence to the City of Chicago and homeowners in the Bridgeview Village project expressing concern regarding dangers to children playing in the area and other potential life/safety issues at the Bridgeport Village project because of design flaws identified in the July 15 Jacobson report. Defendant denies the remaining averments in paragraph 46 of the Adversary Complaint.

**ANSWER:**

47.    Although they were under no obligation to do so, the Plaintiffs met with Brickcraft and A. Splendoria in September 2005 to discuss the July 15 Report and inform Brickcraft of the Plaintiffs' plans to make certain that all the homes in Bridgeport Village were approved by the City of Chicago. The Plaintiffs also requested Brickcraft and the Splendoria Brothers to stop contacting the individual homeowners.

**ANSWER:**    Defendant admits that Brickcraft met with the Plaintiffs in September 2005 to discuss the July 15th report and how the Plaintiffs were planning on effectuating remediation of structural deficiencies as required by the City of Chicago.  Defendant denies the remaining averments contained in paragraph 47 of the Adversary Complaint.

48.     Nevertheless, despite the Plaintiffs' ongoing efforts to remedy certain issues that had been raised by the City — none of which placed the homes in any danger of collapsing — Brickcraft and the Splendoria Brothers continued to demand more information from the Plaintiffs. With each demand, of course, came additional threats.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 48 of the Adversary Complaint regarding plaintiffs' "ongoing efforts to remedy certain issues that had been raised by the City." Defendant admits that Brickcraft continued to request additional information from River Village. Defendant denies the remaining averments in paragraph 48 of the Adversary Complaint.

49.     Meanwhile, the Plaintiffs were engaged in ongoing discussions with the City of Chicago regarding certain construction issues, and informed Brickcraft and the Splendoria Brothers that it would apprise them of the results of those discussions if and when the Plaintiffs reached an agreement with the City.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment in paragraph 49 of the Adversary Complaint that "Plaintiffs were engaged in ongoing discussions with the City of Chicago regarding certain construction issues." Defendant admits that River Village informed Brickcraft "that it would apprise them of the results of those discussions if and when the Plaintiffs reached an agreement with the City".

50.     Once again, however, Brickcraft and the Splendoria Brothers were not satisfied and continued to interfere with the Plaintiffs' business and threatened to "take whatever actions" they deemed necessary to harm the Plaintiffs.

**ANSWER:**    Defendant admits that Brickcraft was not satisfied with responses it received from River Village or its affiliates and that Brickcraft informed River Village that Brickcraft would continue to seek information from River Village. Defendant denies the remaining averments in paragraph 50 of the Adversary Complaint.

**H.    Brickcraft and the Splendoria Brothers Contact
        The Homeowners and Talk to the Media**

51.     By letter dated March 1, 2006, Brickcraft and the Splendoria Brothers raised the bar once again by contacting each of the homeowners at Bridgeport Village and copying BOA,

among many others, with its correspondence. In their correspondence, Brickcraft compared the structural issues at Bridgeport Village with porch collapses that cost the lives of small children and young adults. Such unsubstantiated and unfounded hyperbole was irresponsible, reckless and malicious.

**ANSWER:**    Defendant admits that Brickcraft sent correspondence (copied to Bank of America) to the homeowners of the Bridgeport Village project on March 1, 2006.  Defendant admits that Brickcraft's March 1, 2006 letter referred to individuals who had died due to structural failures of buildings and other structures in the City of Chicago.  Defendant denies the remaining averments in paragraph 51 of the Adversary Complaint.

52.    By letter dated March 3, 2006, the Plaintiffs responded to the defamatory letter by letting the homeowners know that the Plaintiffs were in ongoing discussions with the City and they would be willing to speak with the homeowners at anytime to address any of their concerns. Of course, the Plaintiffs' brief written response prompted several more lengthy letters from Brickcraft and the Splendoria Brothers to all of the homeowners, with copies served on BOA, among many others.

**ANSWER:**    Defendant admits that Plaintiffs sent a written communication to the homeowners of the Bridgeport Village project on March 3, 2006 addressing and mischaracterizing the structural integrity of their homes.  Defendant denies the remaining averments in paragraph 52 of the Adversary Complaint.

53.    Still further, Brickcraft and the Splendoria Brothers began engaging in separate correspondence with certain individual homeowners, such as Jose Ruiz, Kathy Antunovich and Matthew and Michelle Ryan, encouraging them to raise havoc with the Plaintiffs. Indeed, at every turn, Brickcraft and the Splendoria Brothers attempted to raise concerns with the homeowners that were speculative and unsubstantiated at best.

**ANSWER:**    Defendant admits that, at times, Brickcraft communicated directly with certain individual homeowners in the Bridgeport Village project.  Defendant denies the remaining averments in paragraph 53 of the Adversary Complaint.

54.    In their correspondence, Brickcraft and the Splendoria Brothers went out of their way to slander the Plaintiffs' reputation and place them in a false light. Indeed, Brickcraft and the Splendoria Brothers referred to information provided by the Plaintiffs as "smoke & mirrors" and a "gross misrepresentations of the facts." Brickcraft and the Splendoria Brothers told the homeowners that they were "too easily bs'd" by the Plaintiffs and that they did not have the

ability to "cut through the [Plaintiffs'] lies and/or misrepresentations." Brickcraft and the Splendoria Brothers claimed that the Plaintiffs had committed fraud and that the "Developer [was] both personally and criminally responsible."

**ANSWER:**    Defendant admits that Brickcraft's correspondence "referred to information provided by the Plaintiffs as 'smoke & mirrors' and a 'gross misrepresentations of the facts'" and that Brickcraft told homeowners "that they were 'too easily bs'd' by the Plaintiffs and that they did not have the ability to 'cut through the [Plaintiffs'] lies and/or misrepresentations.' Defendant denies the remaining averments contained in the first sentence in paragraph 54 of the Adversary Complaint.

55.    In January 2007, Brickcraft and the Splendoria Brothers began spreading their accusations to the media.

**ANSWER:**    Defendant denies the averments in paragraph 55 of the Adversary Complaint.

56.    Through their communications with the media, Brickcraft and the Splendoria Brothers continued to fuel the fire they started by accusing the Plaintiffs of engaging in delay tactics and withholding documents from the homeowners. Brickcraft and the Splendoria Brothers, moreover, repeatedly gave their so-called expert opinion of the cause of the alleged problems with some of the homes in Bridgeport Village, even though they had not done any investigation, much less a proper investigation, into the issue.

**ANSWER:**    Defendant denies the averments in paragraph 56 of the Adversary Complaint.

**I.    The Bank Ends Its Relationship With JS II**

57.    Not surprisingly, Brickcraft's persistent oral and written correspondence to BOA regarding its alleged structural concerns interfered with JS II's lending relationship with BOA. BOA had originally provided the Plaintiffs with both a land loan of approximately $4.4 million dollars and a revolving line of credit of approximately $1.1 million. BOA routinely extended both the land loan and line of credit through various amendments.

**ANSWER:**    Defendant denies the averments contained in the first sentence in paragraph 57 of the Adversary Complaint.  Defendant admits the averments contained in the second sentence in paragraph 57 of the Adversary Complaint.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in the third sentence in paragraph 57 of the Adversary Complaint.

58.     However, in late 2004 and early 2005, BOA made a decision to end its relationship with both JS II and its relationship with John Kinsella and Sid Diamond (two of JS II's members who had guaranteed the financing). BOA's decision to end these relationships was based in significant part to the significant damage Brickcraft and the Splendoria Brothers had done to JS II's reputation and the panic Brickcraft and the Splendoria Brothers had caused by claiming that the homes in Bridgeport Village were structurally unsound and could collapse. Indeed, BOA perceived that its own reputation would be at risk if it continued to provide financing to JS II in light of the malicious allegations being made by Brickcraft and the Splendoria Brothers against JS II.

**ANSWER:**     Defendant admits that Bank of America terminated its lending relationship with

JS II.  Defendant denies the remaining averments contained in paragraph 58 of the Adversary

Complaint.

59.     Consequently, the Plaintiffs had no choice but to seek alternative financing with a new lender. The additional cost of the new financing was significant to the Plaintiffs.

**ANSWER:**     Defendant denies the averments contained in paragraph 59 of the Adversary

Complaint.

## COUNT I
### (Defamation against Brickcraft and the Splendoria Brothers)

60.     Plaintiffs incorporate the allegations in Paragraphs 1 through 61 of the Adversary Complaint as though fully set forth herein.

**ANSWER:**     Defendant realleges and incorporates by reference his responses to the averments

contained in paragraphs 1 though [sic] 61 above as his response to paragraph 60 of Count I of the

Adversary Complaint.

61.     At all relevant times, the Splendoria Brothers were acting both in their individual capacity and as officers of Brickcraft.

**ANSWER:**     Defendant denies the averments contained in paragraph 61 of Count I of the

Adversary Complaint.

62.     At numerous times beginning in May 2003 and continuing through the Petition Date, Brickcraft and the Splendoria Brothers made numerous oral and written false and unprivileged statements and misrepresentations to third parties regarding the Plaintiffs and the homes built by the Plaintiffs at Bridgeport Village.

**ANSWER:**    Defendant denies the averments contained in paragraph 62 of Count I of the Adversary Complaint.

63.    These false statements and misrepresentations were and are defamatory *per se* as they imputed a lack of ability in the Plaintiffs' trade, profession and business.

**ANSWER:**    Defendant denies the averments contained in paragraph 63 of Count I of the Adversary Complaint.

64.    Moreover, these false statements and representations were recklessly made without either Brickcraft or the Splendoria Brothers conducting a proper investigation of the truth of the matters that were the subject of their statements and misrepresentations.

**ANSWER:**    Defendant denies the averments contained in paragraph 64 of Count I of the Adversary Complaint.

65.    The Plaintiffs suffered damages as a result of the false statements and misrepresentations recklessly made by Brickcraft and the Splendoria Brothers.

**ANSWER:**    Defendant denies the averments contained in paragraph 65 of Count I of the Adversary Complaint.

66.    As a direct and proximate cause of the false statements and representations recklessly made by Brickcraft and the Splendoria Brothers, Plaintiffs have incurred damages in excess of $1 million that it has spent or incurred to remedy the harm caused by Brickcraft and the Splendoria Brothers.

**ANSWER:**    Defendant denies the averments contained in paragraph 66 of Count I of the Adversary Complaint.

67.    The conduct of Brickcraft and the Splendoria Brothers was egregious and with actual malice, and justifies an award of punitive damages.

**ANSWER:**    Defendant denies the averments contained in paragraph 67 of Count I of the Adversary Complaint.

## COUNT II
### (Intentional Interference With Prospective Economic
### Advantage and Business Relations Against Brickcraft and the Splendoria Brothers)

68.    Plaintiffs incorporate the allegations in Paragraphs 1 through [sic] 61 of the Adversary Complaint as though fully set forth herein.

**ANSWER:**    Defendant realleges and incorporates by reference his responses to the averments contained in paragraphs 1 though [sic] 61 above as his response to paragraph 68 of Count II of the Adversary Complaint.

69.    At all relevant times, the Splendoria Brothers were acting both in their individual capacity and as officers of Brickcraft.

**ANSWER:**    Defendant denies the averment contained in paragraph 69 of Count II of the Adversary Complaint.

70.    In May 2003, the Plaintiffs had an ongoing, valid business relationship with Bank of America whereby Bank of America provided certain lending and financial services to the Plaintiffs.

**ANSWER:**    Defendant admits the averments contained in paragraph 70 of Count II of the Adversary Complaint, except that Defendant is without knowledge or information sufficient to form a belief as to the truth of whether Plaintiffs' business relationship with the Bank of America was "valid".

71.    The Plaintiffs had a reasonable expectancy of continuing that valid business relationship with Bank of America for so long as that relationship was necessary in connection with the Bridgeport Village project.

**ANSWER:**    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 71 of Count II of the Adversary Complaint.

72.    Brickcraft and the Splendoria Brothers were aware of the Plaintiffs' business relationship with Bank of America and were aware of the Plaintiffs' expectancy that this business relationship would continue at least until the completion of the Bridgeport Village project.

**ANSWER:**    Defendant admits that Brickcraft and the Splendoria Brothers were aware of Plaintiffs' business relationship with the Bank of America.  Defendant denies the remaining averments contained in paragraph 72 of Count II of the Adversary Complaint.

**ANSWER:**

73.    Brickcraft and the Splendoria Brothers intentionally and unjustifiably interfered with the Plaintiffs' business relationship with Bank of America and induced or caused Bank of America to terminate that relationship.

**ANSWER:**    Defendant denies the averments contained in paragraph 73 of Count II of the Adversary Complaint.

74.    As a direct and proximate result of the conduct of Brickcraft and the Splendoria Brothers, the Plaintiffs have incurred damages in excess of $1 million spent or incurred to remedy the harm caused by Brickcraft and the Splendoria Brothers.

**ANSWER:**    Defendant denies the averments contained in paragraph 74 of Count II of the Adversary Complaint.

75.    The conduct of Brickcraft and the Splendoria Brothers was egregious and with actual malice, and justifies an award of punitive damages.

**ANSWER:**    Defendant denies the averments contained in paragraph 75 of Count II of the Adversary Complaint.

## COUNT III
### (Equitable Subordination against Brickcraft)

Count III is not directed against Defendant and no response thereto is required of him.


## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Count I is barred, in whole or in part, by the applicable one year statute of limitations for defamation actions as set forth in 735 ILCS 5/13-201.

### Second Affirmative Defense

Count II is barred, in whole or in part, by virtue of having been predicated entirely on time-barred defamation claims.

### Third Affirmative Defense

Count I and II are barred, in whole or in part, by judicial admissions made by the owners/officers/and managers of the plaintiffs in litigation by and among John J. Kinsella and Thomas Snitzer.

WHEREFORE, Defendant Anthony Splendoria respectfully requests that this Court enter judgment in his favor and against the Plaintiffs on all Counts asserted against him in the Adversary Complaint.

Dated:  March 17, 2008                              Respectfully submitted,


By: /s/ Robert Radasevich _____
   Robert Radasevich (6180383)
   Jennifer Lee (6290028)
   NEAL, GERBER & EISENBERG LLP
   Two North LaSalle Street, Suite 2200
   Chicago, Illinois  60602
   (312) 269-8000 (telephone)
   (312) 269-1747 (facsimile)

   Attorneys for Anthony Splendoria

## <u>CERTIFICATE OF SERVICE</u>

I, Robert Radasevich, hereby certify that on March 17, 2008, a true and correct copy of **Anthony Splendoria's Answer and Affirmative Defenses to Counts I and II of the Adversary Complaint** was filed electronically and served upon the following parties by operation of the Court's Electronic Filing System:

Steven B. Towbin
Richard A. Saldinger
Jarret Raab
Shaw Gussis Fishman Glantz Wolfson & Towbin LLC
321 North Clark Street
Suite 800
Chicago, IL 60610


_____/s/ Robert Radasevich_____

NGEDOCS: 1514342.1